UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | |
|---|---|
| In re:<br><br>        LAVATEC, INC.<br><br>        Debtor | Chapter 11<br>Case No. 09-32004 (LMW) |

**DISCLOSURE STATEMENT SUBMITTED
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

# I. INTRODUCTION

**A.      Preliminary Statement.**  On July 24, 2009, Lavatec, Inc. (the "Debtor", or "Lavatec"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, New Haven Division (the "Bankruptcy Court"). On August 18, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") and the Debtor together with the Committee are hereinafter collectively referred to as the "Plan Sponsors". The Plan Sponsors have prepared this disclosure statement in connection with a Plan of Reorganization, dated April 8, 2011 (the "Plan"). The Plan Sponsors are seeking confirmation of the Plan by the Bankruptcy Court.

The Plan Sponsors believe that the Plan will result in the greatest possible distribution to Creditors in this bankruptcy case.  The Plan is a liquidation plan under which the assets of the Debtor, including the Debtor's intellectual property (hereinafter "Intangibles"), consisting of the legal name of the Debtor, all names used by the Debtor, including the name Lavatec, Inc., any domain name, any trademarks, any trade names and any good will associated with those names (but excluding its interest in Washex, Inc. and its interest in Causes of Action) will be sold to NEWCO. The sale is subject to higher and better offers. Accordingly, all references to NEWCO shall mean Laundry Acquisition Inc. or the highest and best bidder (High Bidder) as determined under a separate Sale Procedures Order; except that the break-up fee (referred to in that Order) will only be payable to Laundry Acquisition Inc. Causes of Action, if any, will be liquidated for the benefit of Creditors; and the Debtor's interest in Washex, Inc. will be abandoned as worthless.

THE PLAN SPONSORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S CREDITORS.  ALL CREDITORS ARE URGED TO VOTE FOR THE PLAN.  VOTING INSTRUCTIONS ARE CONTAINED AT PAGES __ TO __ OF THIS DISCLOSURE STATEMENT.  TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND RECEIVED BY 5:00 P.M., EASTERN STANDARD TIME ON _____   ___, 2011, UNLESS THE TIME FOR VOTING IS EXTENDED.

In connection with the solicitation of acceptances of the Plan, this disclosure statement is provided in accordance with Bankruptcy Code section 1125 to: (a) all persons and entities who have filed proofs of Claim or Interest against the Debtor; (b) all persons whose Claims were scheduled by the Debtor as not disputed, contingent, or unliquidated; and (c) certain other parties in interest. This disclosure statement is intended to provide the Debtor's Creditors and Interest holders with information of a kind, and in sufficient detail, that would enable a hypothetical reasonable investor typical of holders of Claims or Interests to make an informed judgment about the Plan and whether to vote to accept or reject the Plan. This disclosure statement has been approved by an order of the Bankruptcy Court, as containing "adequate information" as that term is defined in Bankruptcy Code section 1125. However, the Bankruptcy Court has not passed upon the merits of the Plan or upon the accuracy of the information, assumptions and projections contained herein, and neither this disclosure statement nor the order approving it should be construed as approval or endorsement of the Plan by the Bankruptcy Court.

Creditors and Interest holders are encouraged to read and carefully consider the entire disclosure statement prior to voting on the Plan. In addition, the Plan is an integral part of this disclosure statement. Accordingly, all members of voting classes are urged to study the Plan carefully in conjunction with this disclosure statement in order to make an informed judgment about the Plan. Creditors and Interest holders should also consider consulting with their own legal counsel regarding this disclosure statement and the Plan.

No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement. In voting on the Plan, Creditors and Interest holders should not rely on any information relating to the Debtor or its businesses other than the information contained in this Disclosure Statement.

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summaries of the Plan contained in this Disclosure Statement are qualified by reference to the Plan itself. If any inconsistency exists between this Disclosure Statement and the Plan, the terms of the Plan are controlling.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, THE CONSUMMATION AND EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT AS DESCRIBED HEREIN AND IN THE PLAN.   THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

B.      **Voting Procedures and Requirements and Confirmation of the Plan.**  A ballot to be used for voting to accept or reject the Plan is enclosed with all copies of the disclosure statement which have been mailed to Creditors and Interest holders entitled to vote. The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for acceptance or rejection of the Plan must be received by counsel for the Debtor no later than 5:00 p.m., Eastern Daylight Time, on _____ ___, 2011, at the following address:

> Dean W. Baker, Esq.
> Law Offices of Dean W. Baker
> 195 Church Street, Floor 8
> New Haven, CT 06510

If you have any questions about the procedure for voting, or if you did not receive a ballot that you believe you should have received, please contact:

> Dean W. Baker, Esq.
> Law Offices of Dean W. Baker
> 195 Church Street, Floor 8
> New Haven, CT 06510
> Tel: (203) 777-5666
> Fax: (203) 773-1427
> Email: dean@bohonnon.com

> Or counsel for the Committee:

> Carl T. Gulliver, Esq.
> Coan, Lewendon, Gulliver & Miltenberger, LLC
> 495  Orange Street
> New Haven, CT  06511
> Tel: (203) 624-4756
> Fax: (203) 865-3673
> Email: cgulliver@coanlewendon.com

Classes of Claims or Interests that are not "impaired" under the Plan are deemed to have accepted the Plan, and the Debtor need not solicit the votes of Creditors or Interest holders in such classes.  Any Creditor or Interest holder whose Claim or Interest is impaired under the Plan is entitled to vote if either (i) its Claim or Interest is scheduled by the Debtor (and such Claim or Interest is not

scheduled as disputed, contingent or unliquidated) or (ii) it has timely filed a proof of Claim or Interest, which proof of Claim or Interest is not the subject of a timely filed objection that has not been withdrawn on or before any date fixed for filing such objection by the Plan or order of the Bankruptcy Court and that has not been denied by a Final Order. Any holder of a Disputed Claim or of an Interest that is disputed is not entitled to vote unless, upon application of such holder, the Bankruptcy Court temporarily allows the Claim or Interest in an amount that it deems proper for the purposes of accepting or rejecting the Plan. A Creditor's vote or an Interest holder's vote may be disregarded if the Bankruptcy Court determines that such Creditor's or Interest holder's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan of reorganization unless, with respect to each claim or interest of such class, the plan:

(1)      leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2)      notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of such claim or interest after the occurrence of a default–

(A)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) does not require to be cured;

(B)      reinstates the maturity of such claim or interest as such maturity existed before such default;

(C)      compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law;

(D)      if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E)      does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF CLASSES WHO ARE ENTITLED TO VOTE.  Holders of Classes 2, 3, and 7 may vote to accept or to reject the Plan only by completing and mailing the enclosed Ballot to the address listed above for counsel to the Debtor (i.e. Dean W. Baker) so that it will be received by Dean W. Baker no later than 5:00 p.m., Eastern Daylight Time, on _____ ___, 2011. As a holder of a Claim in such class, your vote on the Plan is important.  For the Plan to be confirmed, one class of impaired Claims must vote to accept the Plan.

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims in that class, but for that purpose counts only those that actually cast ballots for acceptance or rejection of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of holders of interests as acceptance by two-thirds of the number of interests actually voted.  Holders of Claims or Interests that fail to vote are not counted as either accepting or rejecting the plan.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) provides that any party in interest may object to confirmation of a plan. The confirmation hearing on the Plan has been scheduled for _____, 2011, at

4

_____ a.m./p.m., at the United States Bankruptcy Court, 157 Church Street, 18th Floor, New Haven, Connecticut, 06510.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement made at the confirmation hearing or any adjournment thereof.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon

> Dean W. Baker, Esq.
> Law Offices of Dean W. Baker
> 195 Church Street, Floor 8
> New Haven, CT 06510
> dean@bohonnon.com
>
> And
>
> Carl T. Gulliver, Esq.
> Coan, Lewendon, Gulliver & Miltenberger, LLC
> 495  Orange Street
> New Haven, CT  06511
> cgulliver@coanlewendon.com

on or before _____   ___, 2011.  Objections to confirmation of the Plan are governed by Rule 9014. Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met. These requirements include:

1.      That the Plan has classified Claims in a permissible manner.  The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each interest of equity security holders in a class with other claims and interests which are "substantially similar."  The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code.

2.      That the plan proponent has proposed the Plan in good faith.  The Bankruptcy Code provides that for a plan to be confirmed it must be proposed in good faith and not by any means forbidden by law.  The Debtor believes that the Plan has been proposed in good faith and is fair and equitable to all Creditors and Interest Holders.

3.      Notwithstanding acceptance of the Plan by each class of Creditors entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must determine that the Plan is in the best interests of all classes of Creditors or Interest holders impaired under the Plan.  The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of Claims a recovery which has a value at least equal to the value of the distribution which each such Creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  If the Debtor were liquidated under chapter 7, any dividend to holders of Allowed Unsecured Claims would be paid after satisfaction of secured claims and reduced by (a) the costs and expenses of liquidation, and (b) Allowed Administrative Claims, Allowed Priority Claims and Allowed Tax Claims. The costs of liquidation would include the compensation to the chapter 7 trustee and his or her professionals.  The Debtor is proposing a complete distribution of its assets under the chapter 11 plan. The Debtor believes that in a chapter 7 liquidation the amount of proceeds available for distribution to holders of Allowed Unsecured Claims would be less than will be available under the Plan.

Bankruptcy Code section 1129(a)(8) requires that each impaired class of Claims accept the Plan by the requisite votes in order for the Plan to be confirmed.  However, the Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes of Creditors, so long as at least one impaired class of Creditors has accepted the plan. These co-called "cramdown"

provisions of the Bankruptcy Code are set forth in Bankruptcy Code section 1129(b). The Plan Sponsors will seek cramdown in this case of Class 8 Allowed Interests. If any impaired class of Claims entitled to vote, other than Class 2 and Class 3, shall not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Plan Sponsors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) (cramdown) of the Bankruptcy Code or both. The Plan Sponsors will not seek confirmation under section 1129(b) of the Bankruptcy Code with respect to Class 2 and/or Class 3.

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO ITS BUSINESS OPERATIONS, OR THE VALUE OF ITS ASSETS, ITS PROPERTY, AND CREDITORS' CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED. ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT IS OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. THE PLAN SPONSORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE OR WITHOUT OMISSIONS. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT FOR OR AGAINST ANY FILED PLAN. NOTWITHSTANDING THE FOREGOING, THE PLAN SPONSORS HAVE USED THEIR BEST EFFORTS TO HAVE ALL THE INFORMATION CONTAINED HEREIN BE TRUTHFUL AND ACCURATE AND, TO THE BEST OF THE PLAN SPONSOR'S KNOWLEDGE, SUCH INFORMATION IS TRUTHFUL AND ACCURATE.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND SINCE THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.**

Accompanying this disclosure statement are copies of the following documents:

A.      The Plan (**Exhibit A**);

B.      Order Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combined with Notice Thereof;

C.      A Ballot for voting to accept or reject the Plan (the "Ballot"); and

D.      A letter from the Official Committee of Unsecured Creditors in support of the Plan.

**THE PLAN SPONSORS URGE ALL CREDITORS TO VOTE IN FAVOR OF THIS PLAN BECAUSE IT PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS. YOUR "YES" VOTE ON THE ENCLOSED BALLOT IS RECOMMENDED FOR THE FOLLOWING REASONS:**

6

**THE PLAN IS THE RESULT OF EXTENSIVE NEGOTIATIONS BETWEEN THE DEBTOR, WACHOVIA BANK, N.A., AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND HAS THE FULL SUPPORT OF SAID COMMITTEE.**

**-      THE PLAN OPTIMIZES THE VALUES OF, AND MINIMIZES DELAY IN, RECOVERIES BY ALL CREDITORS, AND**

**-      THE PLAN ALLOWS CREDITORS TO PARTICIPATE IN DISTRIBUTIONS IN EXCESS OF THOSE THAT WOULD BE AVAILABLE IF THE DEBTOR WAS LIQUIDATED UNDER CHAPTER 7 OF THE CODE.**

Capitalized terms used in this Disclosure Statement and not defined herein shall have the respective meanings assigned to them in the Plan.

**IRS CIRCULAR 230 NOTICE- TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED , AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR THE MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENENT TAX ADVISOR.**

## II. OVERVIEW OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS ARE URGED TO REVIEW THE PLAN ITSELF, WHICH IS INCLUDED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN A SUMMARY AND THE PLAN.

The Plan is a liquidation plan under which the assets of the Debtor (excluding its interest in Washex, Inc. and in Causes of Action) will be sold to NEWCO. Under the Plan, the following will occur:

(A)      Proceeds generated from the sale to NEWCO will be distributed to creditors in accordance with the terms of the Plan.

(B)      All current equity interests in the Debtor will be extinguished and Allowed Interests will receive no distributions under the Plan.

(C)      A more complete description of the Claims provided for under the Plan and their treatment is provided in Part IV of this Disclosure Statement. The following, however, is a brief description of the Classes provided for in the Plan and the treatment of Claims in such Classes:

| Unclassified | Administrative Expenses | Not Impaired. |
|---|---|---|
| Unclassified | Allowed Tax Claims | Not Impaired. |
| Class 1 | Priority Claims | Not Impaired. |
| Class 2 | Secured Claim | Impaired. |
| Class 3 | Secured Claim | Impaired. |

| Class 4 | Secured Claim | Not Impaired. |
| Class 5 | Secured Claim | Not Impaired. |
| Class 6 | Secured Claim | Not Impaired |
| Class 7 | General Unsecured Claims | Impaired. |
| Class 8 | Equity Interests | Impaired; deemed to reject. |

| Class | Description of Treatment |
|---|---|
| Allowed Administrative Claims | Paid in Cash in full on the Effective Date, the time such Claim is allowed by Final Order, the time for payment of such Claim under the terms and conditions of the transaction, or such other time as is agreed to between the Debtor and the holder of the Claim. Allowed Administrative Claims are not classified and holders of Allowed Administrative Claims are not entitled to vote on the Plan. |
| Allowed Tax Claims | Paid in full in Cash in accordance with Bankruptcy Code section 1129(a)(9)(C) and (D). Allowed Tax Claims are not classified and holders of Allowed Tax Claims are not entitled to vote on the Plan. |
| 1 - Allowed Priority Claims | Paid in full in Cash on the later of the Effective Date and the entry of a Final Order allowing such Claim. This class is not impaired and is not entitled to vote on the Plan. |
| 2. Allowed Secured Claim Wachovia (mortgage) | Paid $2,150,000.00 on the Closing Date. Also paid share of any Overbid Amount payable under 8.3 of Plan. Retain liens until paid. This class is impaired and is entitled to vote on the Plan. |
| 3.- Allowed Secured Wachovia (line of credit) | Paid $150,000.00 on the Closing Date. Also paid share of any Overbid Amount payable under 8.3 of Plan. Retains liens until paid. This class is impaired and is entitled to vote on the Plan. |
| 4 - Allowed Secured Naugatuck | Paid in full on the Closing Date. Retains liens until paid. This class is not impaired and is not entitled to vote on the Plan. |
| 5 - Allowed Secured Wells Fargo | Paid in full on the Closing Date. Retains liens until paid. This class is not impaired and is not entitled to vote on the Plan. |
| 6 - Allowed Secured State of Connecticut | Paid in full on the Closing Date. Retains liens until paid. This class is not impaired and is not entitled to vote on the Plan. |

| 7 - Allowed Unsecured Claims | Paid an initial distribution of $100,000.00 plus share of Overbid Amount payable under 8.3 of Plan (collectively, the "Initial Distribution") within 90 days after the Effective Date. Further distributions are possible. This distribution will be shared pro rata by all allowed Claims in this Class. The deficiency balance due Wachovia on it mortgage debt (i.e. Class 2), line of credit (i.e. Class 3) and unsecured guaranty (Debtor guaranteed debt due from its subsidiary Washex, Inc. to Wachovia) is a Class 7 Allowed Unsecured Claim, entitled to vote in Class 7, but will be treated as subordinated (the "Wachovia Subordinated Claim") to all other Allowed Unsecured Claims for purposes of any payment of the Initial Distribution and any potential future distribution until a maximum dividend of 15% (inclusive of the Initial Distribution) of the gross sum of all other Allowed Unsecured Claims is paid to the other Allowed Unsecured Claims. Any further potential future distribution shall be paid up to a maximum amount of 15% of the Wachovia Subordinated Claim and thereafter all other Allowed Unsecured Claims and the Wachovia Subordinated Claim shall share *pari passu* in any potential futher distributions to Class 7. This class is impaired and is entitled to vote on the Plan. |
| 8 - Allowed Interests | Equity interests will be extinguished. This class is impaired and deemed to have rejected the Plan. |

THE DIVIDEND TO BE PAID TO CLASS 7 ALLOWED UNSECURED CLAIMS UNDER THE PLAN IS UNCERTAIN, AND DEPENDS UPON FACTORS INCLUDING THE ALLOWANCE AND DISALLOWANCE OF CLAIMS AGAINST THE DEBTOR'S ESTATE.

### III. THE DEBTOR AND THE CHAPTER 11 CASE

The following provides a short summary of the Debtor's history and business and significant issues facing the Debtor and its Creditors.

THE COMPANY

A.        *General background*

The Debtor is a Connecticut corporation, that was formed in 1987 to manufacture, install, repair and sell highly sophisticated and automated laundry machines and systems. The Debtor is located at 300 Great Hill Road, Naugatuck, Connecticut 06770 and owns the premises and improvements with an approximately 57,000 square foot manufacturing, warehouse and office facility at that location. Debtor currently has 13 employees. The Debtor is owned 100% by Lavatec Waeschereimaschinen GmbH, a German company ("Lavatec GmbH"). Samir Tadros, the former president of the Debtor, owned 85% of Lavatec GmbH and the remaining shares were held primarily by former employees of Lavatec GmbH. Lavatec GmbH is currently the subject of an insolvency proceeding in Germany. Debtor owns 100% of

9

the shares of Washex, Inc., a Texas corporation that failed to pay its debts as they became due and that shut down operations in September of 2010. Washex, Inc. filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court, New Haven Division, on January 21, 2010 (case no. 10-30156 (LMW). Washex, Inc. is represented by Dean W. Baker (counsel to Lavatec, Inc.). Washex, Inc. sold all of its tangible and intangible personal property assets during the pendency of its chapter 11 case. All other assets of the Washex, Inc. bankruptcy estate (i.e. real estate and receivables) are fully encumbered by Wachovia Bank, N.A. whose claim far exceeds their value and gives rise to a substantial portion of the Wachovia Subordinated Claim described in connection with the treatment of Class 7 above.

B.        *Pre-Bankruptcy History*

        The Debtor filed for Chapter 11 protection on July 24, 2009 (the "Petition Date"). The Debtor decided to file for protection due to the effects of the worldwide recession and the resulting downturn in the laundry machine and systems industry. Insolvency proceedings in Germany involving Lavatec GmbH and its European subsidiary, Lavatec KG, exacerbated the decline of the Debtor, since Lavatec KG was the primary supplier of laundry systems and spare parts to the Debtor. Sales in 2007 were approximately $25,000,000.00 and were approximately $24,500,000.00 in 2008. In 2007, the Debtor showed a profit of approximately $3,350,000.00 and in 2008 it lost approximately $2,400,000.00 after a currency adjustment of $5,000,000.00. Accordingly, during the year period prior to the Petition Date, trade payables grew significantly. By the time of the filing of the bankruptcy petition, the Debtor had significant payables, virtually no cash in the bank and no means to pay current liabilities. The Debtor was on the verge of collapse at the time it filed its bankruptcy case. After consultation with its advisers, the Debtor concluded that filing this Case was necessary to preserve its businesses.

C.        *The chapter 11 case*

        • The Debtor's Chapter 11 petition was filed in the United States Bankruptcy Court for the District of Connecticut, New Haven Division and subsequent to the Petition Date, Debtor continued operating as a debtor in possession. The case is pending before the Honorable Lorraine M. Weil.

        • The Law office of Dean W. Baker of New Haven, Connecticut, represents the Debtor in this Case.

        • Since the Petition Date the Debtor has financed its operations through a series of consensual cash collateral orders with its prepetition secured creditors, Wachovia Bank, N.A., The State of Connecticut and the Internal Revenue Service. The Debtor disputed the secured claim of the Internal Revenue Service (which was based on 2008 projected taxes), filed its 2008 tax return and it was determined that no tax was owed to the Internal Revenue Service.

        • Since the Petition Date the Debtor has also financed its operations through a post-petition borrowing agreement and order. The lender under the borrowing agreement and order is Samir Tadros, Inc., a corporation that is owned in part by Samir Tadros, the former President of the Debtor. Debtor borrowed $125,000.00 under the borrowing facility. The loan, evidenced by the borrowing agreement and order, is secured by a lien on all of the Debtor's property, which lien is subordinate to the preexisting liens and post-petition replacement liens of Wachovia Bank, N.A. and The State of Connecticut. The Plan Sponsors dispute that any money is owed under the borrowing facility to Samir Tadros, Inc.

        • Shortly after the Petition Date, the United States Trustee for the District of Connecticut solicited participation of creditors among those holding the twenty (20) largest claims against the Debtor and appointed the Official Creditors' Committee. Coan, Lewendon, Gulliver & Miltenberger, LLC of New Haven, Connecticut was selected as counsel to the Committee.

        • During the course of this Case the Debtor has been working to trim its costs, increase

10

efficiencies and boost sales. Debtor has also located alternate sources of suppliers of spare parts that were formerly provided by its sister company Lavatec KG.

- The debtor is currently embroiled in a trademark dispute at the United States Patent and Trademark Office ("USPTO"). Wolf-Peter Graeser ("Graeser") recently purchased assets of Debtor's German parent, Lavatec, GmbH, which is in receivership proceedings in Germany. Upon information and belief, Graeser has associated himself with a recently formed Connecticut company named Lavatec Laundry Technology, Inc., ("LLTI") located in Beacon Falls, Connecticut and managed by its president, Mark Thrasher, a former employee of the Debtor. LLTI has approached many of the Debtor's customers to procure their business. Graeser has sent cease and desist letters to the Debtor, stating in essence that he now owns the Mark "LAVATEC" and that the Debtor can no longer use or exploit that Mark. More recently, on December 7, 2010, Graeser (through his attorneys) filed with the USPTO a notice of opposition to Debtor's application for registration of, inter alia, the Mark "LAVATEC". The Debtor believes that it owns the Mark "LAVATEC" and timely filed its answer with the USPTO. Debtor hired the law firm of McCormick, Paulding & Huber LLP in connection with the above described matters and in connection with any litigation concerning Debtor's intellectual property, including trademarks. On or about February 15, 2011 a scheduling conference was conducted by the USPTO concerning the Mark litigation and the next phase will involve a discovery schedule.

D.        _Directors, Executive Officers_

The directors and executive officers of the Debtor who served during the chapter 11 case until July 13, 2011 are as follows:

| | |
|---|---|
| Samir Tadros | Chairman of the Board of Directors, Chief Executive Officer, President, Treasurer, Director |
| Peter Thompson | Secretary |
| Gehard Bernecker | Director |
| Eugen Bender | Director |

On or about July 13, 2011, the sole shareholder of Lavatec, Inc. (ie. the insolvency administrator of the Debtor's parent company, Lavatec GMbh removed the directors and officers of the Debtor and appointed new officers and directors. The directors and executive officers of the Debtor who served during the chapter 11 case after July 13, 2011 are as follows:

| | |
|---|---|
| Patric W. Naumann | Vice President, Chairman, Director |
| Annerose Tashiro | Secretary-Treasurer, Director |
| Peter Thompson | Assistant Secretary |
| Herman Bernstein | President |

Although no promises or agreements have been made by NEWCO with respect to its employees, the Plan Sponsors anticipate that certain employees and management personnel of the Debtor will be employed by NEWCO.

E.        _Business Plan_

The Debtor's business plan continues to be based entirely on the operation of its core business - - the manufacture, installation, repair and sale of highly sophisticated and automated laundry machines

and systems. Since the Petition Date, Debtor has gradually rebuilt its core business as it purchased new spare parts to supply existing customers. The Plan Sponsors have determined that it is in the best interest of all creditors to sell the Debtor's ongoing business to NEWCO.

## IV. SUMMARY OF TREATMENT OF CLAIMS
## AND INTERESTS UNDER THE PLAN

THE FOLLOWING IS A SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE INFORMATION SET FORTH IN THE PLAN, WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.

The Plan Sponsors believe that the Plan affords fair and equitable treatment to all Creditors and will permit Creditors to maximize their recoveries in this bankruptcy case.

A.     **Non-Classified Claims.**

1.     **Allowed Administrative Claims.**  Allowed Administrative Claims include, _inter alia_, the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Debtor's property and operating the Debtor's business, including wages and salaries for services of the Debtor's employees rendered after the Petition Date, post-petition trade claims, post-petition lease claims, post-petition credit provided by Samir Tadros, Inc. and professional fees for the legal advisors of the Debtor and the Creditors' Committee.  Allowed Administrative Claims are not classified under the Plan and, therefore, holders of unpaid Allowed Administrative Claims have no right to accept or reject the Plan.  The Plan Sponsors estimate that as of the Confirmation Date the total amount of Allowed Administrative Claims for professional fees will not exceed approximately $120,000.00. This total includes estimated fees and expenses due to Dean W. Baker, Esq. counsel to the Debtor, and Coan, Lewendon, Gulliver & Miltenberger, LLC counsel to the creditor's committee and McCormick, Paulding & Huber LLP., special counsel to the Debtor. The Plan Sponsors estimate that as of the Confirmation Date the total amount of Allowed Administrative Claims for post-petition credit provided by Samir Tadros, Inc. will not exceed approximately $140,000.00. Such estimates are provided for purposes of projection and planning only; the actual Allowed amounts shall be determined by court order upon application pursuant to applicable bankruptcy law and rules. The Allowed amounts may be lower or higher than the estimated amounts.

Claims incurred in the ordinary course of Debtor's business and outstanding at the time of Confirmation shall be assumed by NEWCO.

All payments to Professional Persons for compensation and reimbursement of expenses and all payments to reimburse the expenses of the Creditors' Committee will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules relating to the payment of interim and final compensation and reimbursement of expenses.  The Bankruptcy Court will review and determine all requests for compensation and reimbursement of expenses.

Treatment of Allowed Administrative Claims under the Plan is in accordance with the requirements of the Bankruptcy Code. From the proceeds of the sale to NEWCO, the Debtor shall pay the holders of Allowed Administrative Claims in full in Cash as follows:

a. Allowed Administrative Claims incurred in the ordinary course of business by the Debtor other than Allowed Administrative Claims of Professional Persons shall, except to the extent that any holder of such Claim expressly otherwise agrees to some different treatment for payment, be paid in Cash on the later of:

i. the time for payment of such Claim in accordance with the terms and conditions of the particular transaction giving rise to such Claim; or

12

ii.  the Effective Date of the Plan.

b.  Allowed Administrative Claims of Professional Persons and Samir Tadros, Inc. will be paid in full in Cash on the later of:

i.  the Effective Date of the Plan;

ii.  the date of entry of a Final Order allowing and determining such Claim or as otherwise agreed to by the holder of such Claim.

The Plan Sponsors dispute that Samir Tadros, Inc. is entitled to be paid for its post-petition claim, on grounds, including but not limited to, *inter alia*, that the claim was in fact paid during the Chapter 11 case. The result of an objection to this claim is uncertain and the claim will be reserved for in full. Any savings, after deduction and payment of any professional fees and costs allocable to the objection and resolution or prosecution of a claim against Samir Tadros, Inc. and or its principal, will be split 50/50 between NEWCO and the Debtor. Any such resolution whether by settlement or litigation shall be made at the sole discretion of the Plan Sponsors subject to any appropriate court approval. The Debtor's portion will be reserved to pay first administrative expenses and then priority claims until such expenses and claims are paid in full, with the balance, if any, to Wachovia Bank, N.A. The maximum savings allocable to this objection is approximately $140,000.00.

2.      **Allowed Tax Claims.**  Allowed Tax Claims are not classified under the Plan and, therefore, have no right to accept or reject the Plan. The State of Connecticut, holder of an unsecured priority tax claim under Bankruptcy Code section 507(a)(8) and a secured priority tax claim (that otherwise meets the description of an unsecured priority claim under Bankruptcy Code section 507(a)(8)) will be paid the total value equal to the allowed  amount of such claims, on the Effective Date of the Plan. All other holders of unsecured priority tax claims under Bankruptcy Code section 507(a)(8) will be paid the total value equal to the allowed  amount of such claims, on the later of Effective Date of the Plan or the date of entry of a Final Order allowing and determining such Claims or as otherwise agreed to by the holder of such Claims. The Plan Sponsors estimate that as of the Confirmation Date the total amount of Allowed Tax Claims will not exceed approximately $34,000.00.

B.      **Classified Claims.**

1.      **Class 1-Allowed Priority Claims.**  Class 1 consists of all Allowed Priority Claims other than Allowed Tax Claims. Paid in full in Cash on the later of the Effective Date and the entry of a Final Order allowing such Claim. The Debtor estimates that the Class 1 Claims total $231,000.00. This class is not impaired and is not entitled to vote on the Plan.

2.      **Class 2 – Allowed Secured Claim of Wachovia**. Class 2 consists of the Allowed Secured Claim of Wachovia Bank, N.A. (Wachovia), evidenced by, inter alia, a note in the original principal amount of $2,992,000.00. The Debtor estimates that the Class 2 Claim including post-petition interest, but exclusive of attorney's fees and costs, is approximately $2,645,067.00. Class 2 will receive $2,150,000.00, generated from the sale to NEWCO. Class 2 shall also receive any portion of the Overbid Amount that Class 2 is entitled to in accordance with Section 8.3 of the Plan. Payment (other than any amount due in accordance with Section 8.3 of the Plan) to Wachovia will be made on the Closing Date. Any claims or rights or remedies that Wachovia has against third parties by virtue of existing guarantees of Debtor's payment obligations to Wachovia are unaffected by the Plan. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. This class is impaired and is entitled to vote on the Plan.

3.        **Class 3 – Allowed Secured Claim of Wachovia**. Class 3 consists of the Allowed Secured Claim of Wachovia Bank, N.A. (Wachovia), evidenced by, *inter alia*, a note (line of credit) in the original principal amount of $500,000.00 which is secured by, *inter alia*, all personal property of the Debtor. The Debtor estimates that the Class 3 Claim including post-petition interest but exclusive of attorney's fees and costs, is approximately $500,000.00. Class 3 will receive on the Closing Date $150,000.00, generated from the sale to NEWCO. Class 3 shall also receive any portion of the Overbid Amount that Class 3 is entitled to in accordance with Section 8.3 of the Plan. Payment (other than any amount due in accordance with Section 8.3 of the Plan) to Wachovia will be made on the Closing Date. Any claims or rights or remedies that Wachovia has against third parties by virtue of existing guarantees of Debtor's payment obligations to Wachovia are unaffected by the Plan. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. This class is impaired and is entitled to vote on the Plan.

4.          **Class 4 – Allowed Secured Claim of Naugatuck**. Class 4 consists of the Allowed Secured Claim of the city of Naugatuck, for real property/personal property taxes. The Debtor estimates that the Class 4 Claim including post-petition interest is approximately $70,000.00. Class 4 will receive the total value equal to the allowed amount of its claims, from the proceeds generated from the sale to NEWCO. Payment to Naugatuck will be made on the Closing Date. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. This class is not impaired and is not entitled to vote on the Plan.

5.          **Class 5 – Allowed Secured Claim of Wells Fargo**. Class 5 consists of the Allowed Secured Claim of the Wells Fargo Financial Leasing, Inc. (Wells Fargo), which has a security interest in the Debtor's lighting fixtures. The Debtor estimates that the Class 5 Claim including post-petition interest is approximately $5,000.00. Class 5 will receive the total value equal to the allowed amount of its claims, generated from the sale to NEWCO. Payment to Wells Fargo will be made on the Closing Date. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. This class is not impaired and is not entitled to vote on the Plan.

6.          **Class 6 – Allowed Secured Claim of State of Connecticut**. Class 6 consists of the Allowed Secured Claim of the State of Connecticut, which is secured by, *inter alia*, all personal property of the Debtor. The Debtor estimates that the Class 6 Claim including post-petition interest is approximately $280,000.00. Class 6 will receive the total value equal to the allowed amount of its claims, generated from the sale to NEWCO. Payment to the State of Connecticut will be made on the Closing Date. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. This class is not impaired and is not entitled to vote on the Plan.

7.          **Class 7 - Allowed Unsecured Claims.**  Class 7 consists of all Allowed Unsecured Claims. Class 7 will receive an initial distribution equal to $100,000.00, plus any portion of the Overbid Amount that Class 7 is entitled to in accordance with Section 8.3 of the Plan (collectively, the "Initial Distribution"), within ninety (90) days after the Effective Date of the Plan. The Initial Distribution will be shared pro rata by all allowed Claims in this Class. The deficiency balance due Wachovia on its mortgage debt (i.e. Class 2), line of credit (i.e. Class 3) and unsecured guaranty (Debtor guaranteed debt due from its subsidiary Washex, Inc. to Wachovia) is a Class 7 Allowed Unsecured Claim, entitled to vote in Class 7, but will be treated as subordinated (the "Wachovia Subordinated Claim") to all other Allowed Unsecured Claims for purposes of any payment of the Initial Distribution. After the Initial Distribution, and within ninety (90) days after any meaningful recovery is made by or for the benefit of the Debtor, each holder of an Allowed Unsecured Claim (other than Wachovia Bank, N.A.) shall receive its Pro Rata share of any future distribution until a maximum dividend of 15% (inclusive of the Initial Distribution) of the gross sum of all Allowed Unsecured Claims (other than Wachovia Bank, N.A.) is achieved. Any further potential distribution shall be paid to Wachovia Bank, N.A. up to a maximum amount of 15% of the Wachovia Subordinated Claim and thereafter *pari passu* to the holders of all other Allowed Unsecured Claims including the Wachovia Subordinated Claim.

15

The sole source of any future recovery for Class 7 will from any preference or other avoidance recoveries and will be paid within ninety (90) days after any meaningful recovery by the Debtor's estate. The Debtor estimates that the Class 7 Claims total approximately $3,850,000.00 in valid claims, and that approximately, $2,350,000.00 of that total is the Wachovia Subordinated Claim. The total claims in this Class 7 could be substantially more and depends on the validity of filed claims that would increase total claims to in excess of $15,850,000.00. That total includes a claim filed by Debtor's parent company, Lavatec GmbH, in the amount of approximately $12,000,000.00, which the Plan Sponsors dispute and is not reflected on the books and records of the Debtor. That claim in the face amount or even any reduced amount, moreover, is not even an allowable claim unless Lavatec GmbH pays the Debtor avoidable payments that aggregate approximately $1,900,000.00 and were paid to the account of Lavatec GmbH in the spring of 2009 and within six (6) months of the Petition Date. See 11 U.S.C. § 502(d) (disallowing claims of entities that do not pay or turn over property that is avoidable; Debtor asserts that the payments were made for no consideration and were made solely because the Debtor's parent needed money to support its operations and former president of the Debtor, Samir Tadros who was also an 85% shareholder of Lavatec GmbH, directed that the payments be made). To date, Lavatec GmbH has not returned or paid the payments at issue and Debtor has been led to believe that the insolvency estate of Lavatec GmbH, pending in Germany, does not have assets to repay the Debtor. This class is impaired and is entitled to vote on the Plan.

C.      **Allowed Interests.**

**Class 8 - all Allowed Interests.** Class 8 shall consist of all Allowed Interests. This class is impaired under the Plan. All equity interests in the Debtor (i.e. all Allowed Interests) will be extinguished and will not receive any property or payment on account of their Interests.

### V. MEANS FOR EXECUTION OF THE PLAN

A.      **The Effective Date.**  Payments under the Plan will be funded through sale of the Debtor's Assets (excluding its ownership interest in Washex, Inc and Causes of Action) free and clear of liens to NEWCO. The sale price is $3,300,000.00 or such higher amount that may be generated from the Auction under the Sale Procedures Order, attached hereto as EXHIBIT B. The form of the Asset Purchase Agreement with NEWCO is attached to the Sale Procedures Order as EXHIBIT B-1 (the "APA"). Effective on the closing to NEWCO, NEWCO will assume Debtor's current liabilities incurred in the ordinary course of business, but excluding any tax liabilities incurred by Debtor prior to closing. The sale shall be free and clear of product liabilities, liabilities for breach of contract, liabilities under environmental and similar laws, liabilities for breaches of product warranties or similar liabilities reflected thereon. NEWCO will not assume, and Debtor will retain, pay, discharge and perform, in full, all other debts, obligations and liabilities of Debtor, known or unknown, fixed, contingent or otherwise, arising out of, or resulting from, Debtor's ownership or operation of its business or the acquired assets prior to the closing, or otherwise. Any litigation involving the mark "LAVATEC" may be taken over by NEWCO at its option; but NEWCO shall not assume any liabilities of the Debtor arising out of or relating to such litigation. NEWCO may assume, in its sole and absolute discretion, any payments to administrative creditors that have not otherwise been satisfied under the Plan. Payments to Class 2, 3, 4, 5 and 6 will be made on the Closing Date. The balance of the funds will be held in a separate non-interest bearing escrow account at Coan, Lewendon, Gulliver & Miltenberger, LLC for distribution in accordance with the Plan. The Debtor designates Herman Bernstein and Peter Thompson to assist counsel to the Debtor and counsel to the Official Committee of Unsecured Creditors with all post-confirmation obligations under the Plan and Herman Bernstein and/or Peter Thompson are further designated as fiduciaries of the Debtor's estate to take all actions and execute all documents required to effect the transactions described in this Plan, including the sale to NEWCO. The Official Committee of Unsecured Creditors shall continue to serve until the latter of entry of a final decree or final distribution.

B.      **Higher and Better Offers.**  The Sale to NEWCO is subject to higher and better offers. Laundry Acquisition Inc. will act as a so called "stalking horse" and has been allowed a break-up fee in the amount

of $ 100,000.00 in the event that the Plan Sponsors consummate a sale of the Debtor's assets (under this Plan, any other Plan or through a 11 U.S.C. § 363 sale) to an entity other than Laundry Acquisition Inc., in which case the break-up fee shall be paid to Laundry Acquisition Inc. at the time of the closing of such sale from the proceeds of such sale. The break-up fee has been approved by an Order of the Bankruptcy Court (Sale Procedures Order) attached hereto as EXHIBIT B, which also approves the terms and form of the APA and bidding procedures for any person that would like to submit a higher and better offer. Exhibit B is incorporated herein by reference. The Debtor's estate shall receive from the successful bidder the new purchase price generated at the Auction under the Sale Procedures Order. The difference between the new purchase price and $3,300,000.00 is referred to as the "Overbid Amount". The Debtor's estate shall receive one-half of the Overbid Amount remaining after payment of the break-up fee of $100,000.00 and the balance of the Overbid Amount will be paid to Wachovia Bank until the bank is paid in full. The Plan Sponsors will reserve from the estate's portion of the Overbid Amount such funds as are necessary in the judgment of the Plan Sponsors to satisfy and pay both Priority Claims and Administrative Claims and the balance of the estate's portion of the Overbid Amount will be disbursed to Class 7. Wachovia Bank's portion of the Overbid Amount will be disbursed to Classes 2 and 3 until the bank is paid in full. The balance of the purchase price will be distributed as provided in Section 8.2 of the Plan (i.e. disbursed to non-classified Claims, Classes 1, 2, 3, 4, 5 and 6, reserved for and paid when allowed to Administrative Claims, and $100,000 disbursed to Class 7). If any deposit is forfeited under the Sale Procedures Order it shall be treated and disbursed in the same manner as the Overbid Amount.

C.    **Causes of Action.**  The Debtor and/or the Official Committee of Unsecured Creditors shall be vested after Confirmation with the right and power to commence or continue all actions or proceedings necessary or desirable to recover or liquidate property or debts, to prosecute litigation and to assert any other claims. Further orders of the Bankruptcy Court will not be necessary after Confirmation in order to confer such rights and powers on the Debtor and/or the Official Committee of Unsecured Creditors. The Debtor and the Official Committee of Unsecured Creditors have reviewed potential preference claims and have concluded that there is at least one potential significant claim that they will pursue. The likelihood of recovery on that claim or other claims is unkown.

D.    **Distributions by the Plan Sponsors.**  The Plan Sponsors shall reserve and distribute Cash and other assets of the Debtor in accordance with the provisions of this Plan.  The Official Committee of Unsecured Creditors shall be responsible for determining the Pro Rata distribution to which each Class 7 Creditor is entitled and for determining the dates upon which such payments are to be made. The Plan Sponsors shall make distributions as often as in their discretion and judgment there is an amount of funds sufficient to make a meaningful distribution to holders of Allowed Claims. Under the Plan, if (i) any distribution made to the holder of any Claim is returned as not deliverable, and such holder fails to notify counsel to the Official Committee of Unsecured Creditors of a proper address before 60 days after the distribution date, or any distribution check remains uncashed for more than 60 days after the date of the check, then the holder of such Allowed Claim shall be deemed to have waived (a) its Allowed Claim, and (b) all rights to any further distribution under this Plan. During such 60 day period, counsel for the Official Committee of Unsecured Creditors shall make a good faith effort to discover a proper address for the holder of such Allowed Claim, and to contact such entity.

D.    **Professionals and Compensation of Professionals after Confirmation Date**.  Counsel to the Plan Sponsors shall continue to provide services they deem necessary or advisable in carrying out the provisions of this Plan, including administration of the payments due under the Plan.

E.    **Plan Sponsor's Powers and Duties.**  The Plan Sponsors shall cause the Debtor (and or the Official Committee of Unsecured Creditors in the case of initiating any lawsuits) to fulfill the obligations under the Plan including, without limitation, the following powers and duties, so long as they are consistent with the Plan:

to protect the property and assets of the Debtor;

17

to pay any taxes payable by the Debtor;

to release, convey and/or assign any right, title or interest in or to the property or assets of the Debtor;

to deposit Debtor funds, draw checks and make disbursements thereof;

to employ and compensate without further order of the Bankruptcy Court persons at such rates of compensation as the Debtor  may deem reasonable;

to take any action required or permitted by the Plan;

to appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

to commence, prosecute or defend any and all actions comprising or affecting property of the Debtor;

to cause any and all Claims to be determined, allowed or disallowed;

to respond to audits and inquiries to the extent that such response(s) is, or are, reasonable and appropriate in the Debtor's discretion; and

to evaluate the advisability of pursuing any suit, action or chose in action that is property of the Debtor, to compromise, withdraw or dismiss any pending suit or action, to give a release to a party and to abandon a suit, action or chose in action.

F.      **Compromise of Actions and Abandonment of Property.**  The Plan Sponsors shall have the joint authority, at their discretion, to: compromise any causes of action vested in the Debtor and any matter relating to the Debtor or its property or assets in the manner and upon the notice prescribed by Rule 9019 of the Federal Rules of Bankruptcy Procedure; and abandon any asset or property of the Debtor that the Plan Sponsors conclude in their sole discretion is burdensome to the Debtor, is of inconsequential value to the Debtor or cannot be effectively prosecuted or pursued because of inadequacy or insufficiency of funds available for such purpose.  Notice shall be given as prescribed by Federal Rule of Bankruptcy Procedure 6007.

G.      **Plan Sponsor's Actions**.  The Plan Sponsors shall be authorized and empowered to take such actions and seek from the Bankruptcy Court such orders, judgment, injunctions and rulings as may be necessary to further fulfill the intentions and purposes of, and to give full effect to, the provisions of the Plan.  The Plan Sponsors shall further be authorized and empowered to file or record in any state or other political subdivision any documents necessary or advisable to implement any aspect of the Plan.

H.      **Objections to Claims**.  Objections to Unsecured Claims, if any, with the exception of any Claim to which an objection may be filed under Bankruptcy Code section 502(d) (as to which Claims an objection need not be filed within the time period set forth hereinafter), shall be filed with the Bankruptcy Court and served upon each holder of a Disputed Claim no later than the sixtieth day following the Confirmation Date.  Except as otherwise set forth herein, objections which are not filed within such sixty (60) day period following the Confirmation Date are barred, precluded and may not be raised.  With respect to any Claim for which no objection is filed within such time, such Claim shall be deemed an Allowed Claim for the amount specified in a timely filed proof of claim with respect to such Claim, or, if no timely filed proof of claim exists, in the amount specified in the Schedules, unless the Claim was specified in the Schedules as being disputed, contingent or unliquidated.  If no timely filed proof of claim exists, and the Claim was specified in the Schedules as being disputed, contingent or unliquidated, the Claim shall be barred and no distribution made thereon pursuant to Bankruptcy Code section 1111(a) and

18

Bankruptcy Rule 3003(c)(2). With respect to any Claim to which a timely objection (which shall expressly be deemed to include any application, motion or complaint seeking subordination of a Claim) is filed (i.e., a "Disputed Claim"), no distribution shall be made to the holder of any such Disputed Claim until the entry of a Final Order or judgment determining the allowed amount of such Disputed Claim. Pending the time of such Final Order or judgment, to the extent that any sum otherwise becomes payable to the holders of Claims of the class to which the Disputed Claim belongs, there shall be reserved by the Debtor an amount equivalent to that amount which would be payable to the holder of the Disputed Claim in the event that such Disputed Claim were allowed in the full amount asserted. Upon final determination of the allowed amount of the Disputed Claim, payment will be made to the holder of the Disputed Claim to the extent necessary to pay the allowed amount of such Claim. No interest shall be paid to any such Disputed Claim that becomes an Allowed Claim regardless of the period of delay in distribution.

I.      **Meaning of Plan Sponsors**. Any reference to one or both of the Plan Sponsors means for purposes of the Plan any one of the Plan Sponsors and in the case that a Plan Sponsor is disqualified, resigns, withdraws or can no longer be considered a Plan Sponsor, the remaining Plan Sponsor shall be deemed to have sponsored this Plan and have assumed the obligations attributable to a the Plan Sponsors.

## VI. MISCELLANEOUS

A.      **Conditions Precedent to Consummation of the Plan.**  The Plan provides that the following shall constitute conditions precedent to the consummation of the Plan:

1.      A Confirmation Order in form and substance that is satisfactory to the Plan Sponsors and NEWCO has been entered on the docket maintained by the Clerk of the Bankruptcy Court;

2.      All conditions of the Asset Purchase Agreement, attached to the Sale Procedures Order as EXHIBIT B-1 (the "APA") must be satisfied; and

B.      **Treatment of Executory Contracts and Unexpired Leases.**  All executory contracts and leases that have not been rejected as of the Confirmation Date shall be deemed to be rejected by the Debtor on the Confirmation Date.

C.      **Retention of Jurisdiction by the Bankruptcy Court.**  Notwithstanding the Confirmation of the Plan or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)      to take any action to resolve any disputes arising out of or relating to any Claim or any equity security interest; to determine other issues presented by or arising under the Plan; and to take any action to resolve any dispute of any creditor with respect to its Claim;

(2)      to construe and to take any action to enforce the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and determine all other matters which may be pending on the Confirmation Date;

(3)      to determine any and all applications for allowance of compensation;

(4)      to determine any and all applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or assignment of executory contracts and the allowance of any Claim resulting therefrom;

(5)      to determine all Causes of Action, applications, adversary proceedings, contested matters and other litigated matters pending on or filed after the Confirmation Date;

(6)            to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(7)            to modify the Plan, or to remedy any apparent non-material defect or omission in the Plan, or to reconcile any non-material inconsistency in the Plan so as to carry out its intent and purposes;

(8)            to adjudicate all Claims as to a security or ownership interest in any property of the Debtor or in any proceeds thereof; and

(9)            to determine (i) all matters and disputes arising out of or in any way relating to the Auction, as defined in the Sale Procedures Order, and (ii) all matters and disputes arising out of or in any way relating to the transactions contemplated by the Plan.

## VII. FEDERAL TAX CONSEQUENCES OF THE PLAN

The  implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences to the Debtor and its Creditors.  No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan.  The tax consequences to any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan. For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below. In addition, the Internal Revenue Code, the Treasury Department's regulations promulgated thereunder, and interpretations of the Internal Revenue Code and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change.  Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties.  The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein.   This discussion does not address state, local or foreign tax consequences.

IN THIS SECTION, AND IN THIS DISCLOSURE STATEMENT GENERALLY, THE DEBTOR AND ITS PROFESSIONALS DO NOT INTEND TO GIVE AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS.  THE DEBTOR ONLY PROVIDES THIS GENERAL INFORMATION TO ASSIST THE PARTIES INVOLVED IN EVALUATING HOW THE PLAN AFFECTS THEM FOR TAX PURPOSES.  CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.  NO RULING HAS BEEN REQUESTED FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.

In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim.  In general, the income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands.

The federal income tax consequences to a Creditor receiving, or entitled to receive, a

distribution in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the Creditor's method of accounting, and its own particular tax situation. Among other things, the federal income tax consequences of a distribution under the Plan will depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent would be included.

The federal income tax consequences of a distribution to a Creditor will also depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount. For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor. On the other hand, if such Creditor had written off the account or note receivable in a prior year, the Creditor would have to treat the amount of the distribution as income.

The transfer and abandonment of assets of the Debtor to secured creditors will result in a net Internal Revenue Code ("IRC") Section 1231 gain to the extent that the amount received by the Debtor exceeds the Debtor's adjusted basis in the transferred assets. In the case of property transferred in satisfaction of recourse debt, the amount received is deemed to be the fair market value of the property transferred. The balance of any recourse debt constitutes cancellation of debt income which under IRC Section 108 may be avoided because the cancellation occurs in the context of the Chapter 11 proceeding. Any income recognized by the Debtor in the current year, including any income from operations, can be offset by allowable business expenses incurred during that year. To the extent the Debtor has net income for the year, net operating loss carryovers available from prior taxable years can be used to reduce or eliminate taxable income for the Debtor's current year.

## VIII. ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) dismissal of the Debtor's chapter 11 case, (b) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code, or (c) an alternative chapter 11 plan. The Debtor believes that the Plan is preferable to the alternatives described below because the Plan provides for an equitable, early distribution to the Debtor's Creditors and because any alternative to confirmation of the Plan would result in significant delays in and probable diminution of recoveries.

A.      **Dismissal of the Debtor's Chapter 11 Case.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's case could be dismissed. Dismissal of the Debtor's chapter 11 case would result in piecemeal litigation and executions of the Debtor's assets without Bankruptcy Court supervision, the result of which would generate substantially less for Creditors than the sums which will be realized under the Plan.

B.      **Liquidation Under Chapter 7.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's case could be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to Creditors in accordance with the priorities established under the Bankruptcy Code. Liquidation under chapter 7 would decrease the amount or value of assets available for distribution. Liquidation under chapter 7 of the Bankruptcy Code would result in diminution of and harm to the Debtor's estate because, *inter alia*, (a) the Debtor's estate would become subject to additional administrative expenses entitled to priority over the Claims of holders of Allowed Unsecured Claim, and (b) distributions to Creditors would be delayed for a substantial period of time. Furthermore, the Plan Sponsors believe

that it is unlikely that Class 7 claims would receive the Initial Distribution, since Wachovia has a first priority voluntary lien on all assets of the Debtor and the State of Connecticut has a second lien on all personal property of the Debtor. A liquidation analysis is attached as EXHIBIT C hereto and made a part hereof.

              C.      **Alternative Chapter 11 Plan.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor, or any other party in interest, could attempt to formulate an alternative chapter 11 plan.  The Plan Sponsors believe that a rehabilitative plan of reorganization is not feasible, and that the only alternatives to the Plan are dismissal of the Debtor's case and liquidation under chapter 7 or chapter 11.  As time passes, the assets available to satisfy Creditor's Claims diminish.  The Plan Sponsors believe that failure to confirm the Plan and formulation of a new liquidating plan would result in substantial expense and delay to the Debtor's estate, and negatively impact the time and amount of distributions to Creditors.

## IX. CONCLUSION AND RECOMMENDATION

        The Plan Sponsors submit that the Plan complies in all respects with chapter 11 of the Bankruptcy Code.  The Plan Sponsors believe, for the reasons described herein and in the Plan, that the Plan offers Creditors the most favorable alternative under existing circumstances.  **ACCORDINGLY, THE PLAN SPONSORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

                            **Lavatec, Inc.**

                            By: /s/  Herman Bernstein
                            Name: Herman Bernstein
                             Its: President

By: /s/  Dean W. Baker
Dean W. Baker, Esq.
Law Offices of Dean W. Baker
195 Church Street, Floor 8
New Haven, CT 06510
(203) 777-5666
dean@bohonnon.com

                            **The Official Committee of Unsecured Creditors**

                            By: /s/  Honor S. Heath
                            Name: Honor S. Heath, Esq.
                             Its: Chairman

By: /s/  Carl T. Gulliver
Carl T. Gulliver, Esq.
Coan, Lewendon, Gulliver & Miltenberger, LLC
495  Orange Street
New Haven, CT  06511
(203) 624-4756
cgulliver@coanlewendon.com

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | |
|---|---|
| In re:<br><br>       LAVATEC, INC.<br><br>       Debtor | Chapter 11<br>Case No. 09-32004 (LMW) |

**PLAN OF LIQUIDATION**
**PROPOSED BY THE DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**ARTICLE I**
**INTRODUCTION AND SUMMARY OF THE PLAN**

On July 24, 2009, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut, New Haven Division.  The Debtor hereby proposes the following Plan of Liquidation (the "Plan") pursuant to Bankruptcy Code section 1121. Reference should be made to the Disclosure Statement Submitted Pursuant to Section 1125 of the Bankruptcy Code with Respect to Plan of Liquidation Proposed by Debtor and Official Committee of Unsecured Creditors, dated April 8, 2011, of the same date, which has been filed and served together with the Plan to provide information adequate to enable Creditors and Interest Holders to make an informed judgment about whether to accept the Plan.

The Debtor and Official Committee of Unsecured Creditors ("Plan Sponsors") believe that the Plan will result in the greatest possible distribution to Creditors in this bankruptcy case. The Plan is a liquidation plan under which the Debtor's assets, including the Debtor's intellectual property (hereinafter "Intangibles"), consisting of the legal name of the Debtor, all names used by the Debtor, including the name Lavatec, Inc., any domain name, any trademarks, any trade names and any good will associated with those names (<u>but excluding</u> its interest in Washex, Inc. and in Causes of Action) will be sold to NEWCO. Causes of Action, if any, will be liquidated for the benefit of Creditors; and the Debtor's interest in Washex, Inc. will be abandoned as worthless. Under the Plan, all cash proceeds derived from the sale of Debtor's assets to NEWCO will be used to pay Creditors in accordance with the terms of this Plan. Any funds that the Debtor recovers through Causes of Action shall be distributed first to the holders of unpaid Allowed Administrative Claims, with the balance to Allowed Unsecured Claims in accordance with the terms of this Plan.

**ARTICLE II**
**DEFINITIONS**

In this Plan the following terms (which appear in this Plan as capitalized terms) have the following meaning:

1.      **"Allowed Administrative Claim"** shall mean any Allowed Claim under Bankruptcy Code section (i) 507(b) or (ii) 503(b) which is entitled to priority under Bankruptcy Code section 507(a)(2).

2.      **"Allowed Claim"** shall mean a Claim against the Debtor to the extent that:

The Claim has been scheduled by the Debtor as other than contingent, unliquidated or disputed and no proof of claim has been timely filed; or

A proof of claim has been timely filed; and, either

(i) the Claim is not a Disputed Claim (but only to the extent that such Claim is not a Disputed Claim); or

(ii) the Claim has been allowed (and only to the extent allowed) by a Final Order.

3.      **"Allowed Interest"** shall mean any Equity Interest in the Debtor, as to which no objection has been made or which has been allowed by a Final Order.

4.      **"Allowed Priority Claim"** shall mean that portion of an Allowed Claim entitled to priority under Bankruptcy Code section 507(a)(4), (5), (6) or (7).

5.      **"Allowed Secured Claim"** shall mean that portion of an Allowed Claim which is determined to be secured under Bankruptcy Code section 506.

6.      **"Allowed Tax Claim"** shall mean that portion of an Allowed Claim entitled to priority under Bankruptcy Code section 507(a)(8).

7.      **"Allowed Unsecured Claim"** shall mean an Allowed Claim against the Debtor that arose or is deemed to have arisen before the Filing Date which is not an
Allowed Secured Claim, an Allowed Administrative Claim, an Allowed Tax Claim, or an Allowed Priority Claim, but includes, without limitation, Deficiency Claims and Claims arising from the rejection of executory contracts and unexpired leases.

8.      **"Bankruptcy Code"** shall mean title 11 of the United States Code, as now in effect or hereafter amended.

9.      **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Connecticut, New Haven Division.

10.     **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended, the Local Rules of the United States District Court for the District of Connecticut, as amended, and the Local Rules and standing orders of the Bankruptcy Court, as amended, all as applicable to this case.

11.     **"Business Day"** shall mean any day other than a day on which banks are authorized to close under the laws of the State of Connecticut.

12.     **"Cash"** shall mean cash, cash equivalents, and other readily marketable securities or instruments.

13.     **"Claim"** shall mean any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an

2

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, all as set forth in Bankruptcy Code section 101(5).

14.    **"Causes of Action"** shall mean all causes of action and actions that may be brought (i) under sections 544, 547 through 551 and 553 of the Bankruptcy Code (including a potential claim to avoid transfers made to Lavatec GmbH) and (ii) against Samir Tadros and/or Samir Tadros, Inc. to recover salary or payments made to Samir Tadros, Inc.

15.    **"Closing Date"** shall mean the date the sale to NEWCO is consummated (i.e. closed).

16.    **"Confirmation"** shall mean entry of the Confirmation Order.

17.    **"Confirmation Date"** shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

18.    **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

19.    **"Creditor"** shall mean an entity that has a Claim against (a) the Debtor that arose at the time of or before the Filing Date or (b) the Debtor's estate of a kind specified in Bankruptcy Code section 502(g), (h) or (i).

20.    **"Creditors' Committee"** shall mean the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case pursuant to Bankruptcy Code section 1102, as the same may be changed or modified consistent with the provisions of the Bankruptcy Code.

21.    **"Debtor"** means Lavatec, Inc., as Debtor and Debtor-in-Possession under the Bankruptcy Code.

22.    **"Deficiency Claim"** shall mean that portion of an Allowed Claim which is determined to be unsecured under Bankruptcy Code section 506.

23.    **"Disclosure Statement"** shall mean the Disclosure Statement Submitted Pursuant to Section 1125 of the Bankruptcy Code with Respect to Plan of Reorganization Proposed by Debtor and the Official Committee of Unsecured Creditors, Dated April 8, 2011.

24.    **"Disputed Claim"** shall mean a Claim against the Debtor, to the extent that a proof of claim has been timely filed or deemed timely filed under applicable law, as to which an objection has been or may be timely filed by any party in interest and which objection, if timely filed, has not been withdrawn on or before any date fixed for filing such objections by the Plan or order of the Bankruptcy Court, and has not been overruled by a Final Order.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.  Prior to the time that an objection has been or may be timely filed, for the purposes of this Plan a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in the proof of claim exceeds the amount of the Claim scheduled by the Debtor as other than disputed, contingent or unliquidated.

25.    **"Effective Date"** shall mean a date that is no later than fifteen Business Days after the Confirmation Date and a day on which (i) an order staying the Confirmation Order is not in effect; (ii) the sale to NEWCO has been consummated and (iii) the conditions precedent in Article XI have been satisfied or waived.

26.    **"Equity Interest"** shall mean the interest in any equity security in or of any of the Debtor represented by any issued and outstanding shares of common or preferred stock or other

3

instrument evidencing a present ownership interest in the Debtor, whether or not transferable, including (a) any option, warrant, call, subscription, or other right, contractual or otherwise, to acquire any such interest and any redemption, conversion, exchange, voting participation, dividend rights, and liquidation preferences relating to any such equity security, and (b) all rights, interests, and Claims (including Claims for fraud, misrepresentation, rescission, reimbursement, contribution, or damages) arising under or in connection with (i) all agreements, including stockholder agreements and management agreements, entered into by the Debtor in connection with the issuance of such security or (ii) the purchase or sale of such security.

27.      **"Filing Date"** shall mean July 24, 2009.

28.      **"Final Order"** shall mean an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek certiorari or review has expired and as to which no appeal or petition for certiorari or review is pending or as to which any right to appeal or to seek certiorari or review has been waived.

29.      **"NEWCO"** shall mean Laundry Acquisition Inc. or the highest and best bidder (High Bidder) as determined under the Sale Procedures Order; except that the break-up fee referred to in the Sale Procedures Order, shall always be payable to Laundry Acquisition Inc..

30.      **"Plan"** shall mean this Plan of Reorganization and any exhibits or duly authorized amendments hereto.

31.      **"Professional Persons"** shall mean those persons or firms that have been retained by the Debtor or the Creditors' Committee and approved by the Bankruptcy Court pursuant to Bankruptcy Code section 327.

32.      **"Pro Rata"** shall mean the ratio of an Allowed Claim or Allowed Interest in a particular class of Claims or interests to the amount of all Allowed Claims or Allowed Interests in the class.

33.      **"Representatives"** shall means, with respect to any particular person or entity, such person or entity's officers, directors, employees, members, partners, principals, managers, agents, advisors (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities), affiliates, and representatives.

34.      **"Sale Procedures Order"** shall mean the order of the Bankruptcy Court approving, inter alia, the break-up fee to NEWCO and sales procedures for sale of Debtor's assets to the highest and best bidder.

35.      **"Schedules"** shall mean the schedules of assets and liabilities, as amended and as may be further amended, filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007.

36.      **"Wachovia Subordinated Claim"** shall mean all Allowed Unsecured Claims of Wachovia Bank, N.A., including, without limitation, any Deficiency Claim of Wachovia Bank, N.A.

Terms not defined herein which are defined in the Disclosure Statement shall have the meaning assigned to such term in the Disclosure Statement. A term used in the Plan that is not defined in the Plan or Disclosure Statement but is used in the Bankruptcy Code or Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or Bankruptcy Rules.

## ARTICLE III
## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

4

3.1     All Claims against the Debtor, of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute, or contingent, including all Claims arising from the rejection of executory contracts, and Allowed Interests in the Debtor, shall be bound by the provisions of this Plan and are hereby classified as follows:

3.2     **Allowed Administrative Claims.** Allowed Administrative Claims are not classified under the Plan and, therefore, have no right to accept or reject the Plan.  The Debtor estimates that as of the Confirmation Date the total amount of Allowed Administrative Claims will not exceed approximately $260,000.00. This total includes estimated fees and expenses due to Dean W. Baker, Esq. counsel to the Debtor, and Coan, Lewendon, Gulliver & Miltenberger, LLC counsel to the Creditor's Committee and McCormick, Paulding & Huber LLP., special counsel to the Debtor, as well as amounts due Samir Tadros, Inc. for post-petition credit provided to the Debtor. Treatment of such Claims under the Plan is in accordance with the requirements of the Bankruptcy Code.

3.3     **Allowed Tax Claims.**   Allowed Tax Claims are not classified under the Plan and, therefore, have no right to accept or reject the Plan.  Treatment of Allowed Tax Claims under the Plan is in accordance with the requirements of the Bankruptcy Code.

3.4     **Class 1 - Allowed Priority Claims.**  Class 1 consists of any unpaid Allowed Priority Claims. This class is unimpaired and is not entitled to vote on the Plan.

3.5     **Class 2 - Allowed Secured Claim of Wachovia Bank, N.A. (mortgage note secured by the Debtor's real property).**  Class 2 consists of an Allowed Secured Claim of Wachovia Bank, N.A.  This class is impaired and is entitled to vote on the Plan.

3.6     **Class 3 - Allowed Secured Claim of Wachovia Bank, N.A. (line of credit secured by the Debtor's real and personal property).**  Class 3 consists of an Allowed Secured Claim of Wachovia Bank, N.A.  This class is impaired and is entitled to vote on the Plan.

3.7     **Class 4 - Allowed Secured Claim of City of Naugatuck.**  Class 4 consists of all Allowed Secured Claims of the City of Naugatuck.  This class is unimpaired and is not entitled to vote on the Plan.

3.8     **Class 5 - Allowed Secured Claim of Wells Fargo Financial Leasing, Inc.**  Class 5 consists of all Allowed Secured Claims of Wells Fargo Financial Leasing, Inc.  This class is unimpaired and is not entitled to vote on the Plan.

3.9     **Class 6 - Allowed Secured Claim of the State of Connecticut.**  Class 6 consists of all Allowed Secured Claims of the State of Connecticut.  This class is unimpaired and is not entitled to vote on the Plan.

3.10    **Class 7 - Allowed Unsecured Claims.**  Class 7 consists of all Allowed Unsecured Claims.  This class is impaired and is entitled to vote on the Plan.

3.11    **Class 8 - Allowed Interests.**   Class 8 shall consist of all Allowed Interests. All ownership/equity interests in the Debtor (i.e. all Allowed Interests) will be extinguished and will not receive any property or payment on account of their Interests. This class is impaired and is deemed to have rejected the Plan.

**ARTICLE IV**
**TREATMENT OF ALLOWED ADMINISTRATIVE**
**CLAIMS AND ALLOWED TAX CLAIMS**

5

4.1    **Allowed Administrative Claims.**  Each holder of an Allowed Administrative Claim shall be paid in full in cash on the later of (i) the Effective Date of the Plan and, where allowance of such Administrative Claim is required by the Bankruptcy Court, (ii) the date of the entry of a Final Order allowing and determining such Administrative Claim; provided, however, that (a) such holder may be treated on such less favorable terms as may be agreed to by such holder and (b) Administrative Claims representing liabilities incurred by the Debtor in the ordinary course of business during the case shall be paid in accordance with the terms and provisions of the particular transactions and agreements relating thereto, and to the extent such ordinary course Administrative Claims are outstanding at the time of closing of the sale to NEWCO, they will be assumed and paid by NEWCO.

4.2    **Allowed Tax Claims.**  Each holder of an Allowed Tax Claim (i) shall be paid in full in Cash on the later of (a) the Effective Date of the Plan or (b) the entry of a Final Order allowing and determining such Tax Claim, or (ii) shall be paid on such other terms as have been or may be agreed to between such holder and the Debtor.

**ARTICLE V**
**TREATMENT OF CLASSES NOT IMPAIRED UNDER THE PLAN**

5.1    **Class 1 - Allowed Priority Claims.**   On the Effective Date, the Debtor shall pay Allowed Priority Claims in full in Cash.

5.2    **Class 4 – Allowed Secured Claim of Naugatuck**. The Debtor will make distributions to the holders of Class 4 Allowed Secured Claims in full satisfaction of their allowed claims as follows: On the Closing Date, the Debtor shall pay Class 4 in full in Cash. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens.

5.3    **Class 5 – Allowed Secured Claim of Wells Fargo**. The Debtor will make distributions to the holders of Class 5 Allowed Secured Claims in full satisfaction of their allowed claims as follows: On the Closing Date, the Debtor shall pay Class 5 in full in Cash. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens.

5.4    **Class 6 – Allowed Secured Claim of the State of Connecticut**. The Debtor will make distributions to the holders of Class 6 Allowed Secured Claims in full satisfaction of their allowed claims as follows: On the Closing Date, the Debtor shall pay Class 6 in full in Cash. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens.

**ARTICLE VI**
**TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN**

6.1    **Class 2 – Allowed Secured Claim of Wachovia**. The Debtor will make distributions to the holders of Class 2 Allowed Secured Claims in full satisfaction of their allowed claims as follows: On the Closing Date, Class 2 will receive $2,150,000.00, of proceeds from the sale to NEWCO as described in Section 8.2 below. Class 2 shall also receive any portion of the Overbid Amount that Class 2 is entitled to in accordance with Section 8.3 of this Plan. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. Any claims or rights or remedies that Wachovia has against third parties by

virtue of existing guarantees of Debtor's payment obligations to Wachovia are unaffected by the Plan.

6.2    **Class 3 – Allowed Secured Claim of Wachovia.** The Debtor will make distributions to the holders of Class 3 Allowed Secured Claims in full satisfaction of their allowed claims as follows: On the Closing Date, Class 3 will receive $150,000.00, of proceeds from the sale to NEWCO as described in Section 8.2 below. Class 3 shall also receive any portion of the Overbid Amount that Class 3 is entitled to in accordance with Section 8.3 of this Plan. This Class shall retain its liens securing its Claims until paid in accordance with the terms of the Plan. Upon payment and or compliance with treatment of this Class, the holders of the Claims in this Class will release their liens. Any claims or rights or remedies that Wachovia has against third parties by virtue of existing guarantees of Debtor's payment obligations to Wachovia are unaffected by the Plan.

6.3    **Class 7 - Allowed Unsecured Claims.** The Debtor will make distributions to the holders of Class 7 Allowed Unsecured Claims in full satisfaction of their Allowed Claims as follows:

(a) Within ninety (90) days after the Effective Date of the Plan each holder of an Allowed Unsecured Claim (other than Wachovia Bank, N.A.) shall receive its Pro Rata share of $100,000.00, plus any portion of the Overbid Amount that Class 7 is entitled to in accordance with Section 8.3 of this Plan (collectively, the "Initial Distribution") until a distribution of 15% is achieved.

(b) After the Initial Distribution, and within ninety (90) days after any meaningful recovery is made by or for the benefit of the Debtor from Causes of Action or other recoveries, each holder of an Allowed Unsecured Claim (other than Wachovia Bank, N.A.) shall receive its Pro Rata share of any future distribution until a maximum dividend of 15% (inclusive of the Initial Distribution) of the gross sum of all Allowed Unsecured Claims (other than Wachovia Bank, N.A.) is achieved. Any further potential distribution shall be paid to Wachovia Bank, N.A. up to a maximum amount of 15% of the Wachovia Subordinated Claim and thereafter *pari passu* to the holders of all Allowed Unsecured Claims including the Wachovia Subordinated Claim.

To the extent that an Unsecured Claim is the subject of an objection and/or Avoidance Action at the time of a distribution (and, therefore, not eligible to receive payment), or is otherwise not entitled to distribution, sufficient sums shall be held back from any such distribution to preserve the sums otherwise payable to the holder of such Claim until resolution of the objection and/or Avoidance Action. In no event shall interest or other accretions be payable upon such Disputed Claims or Claims subject to Causes of Action, that later become Allowed Claims.

6.4    **Class 8 - Allowed Interests.** Class 8 shall consist of all Allowed Interests. All Equity Interests in the Debtor (i.e. all Allowed Interests) will be extinguished and will not receive any property or payment on account of their Interests.

6.5    **Nonconsensual Confirmation.** If any impaired class of Claims entitled to vote, other than Class 2 and Class 3, shall not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Plan Sponsors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. The Plan Sponsors shall not seek confirmation under section 1129(b) of the Bankruptcy Code with respect to Class 2 and/or Class 3. The Plan Sponsors will also seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 8 Allowed Interests.

**ARTICLE VII**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASE**S

7.1     All executory contracts and leases that have not been assumed or rejected as of the Confirmation Date shall be deemed to be rejected by the Debtor on the Confirmation Date. **THE CONFIRMATION ORDER SHALL CONSTITUTE NOTICE TO ALL HOLDERS OF EXECUTORY CONTRACTS REJECTED BY THE DEBTOR OR THIS PLAN WHO ASSERT CLAIMS ARISING FROM SUCH REJECTION THAT SUCH CLAIMS SHALL BE FILED NOT LATER THAN 30 DAYS AFTER CONFIRMATION OR BE FOREVER BARRED.**


### ARTICLE VIII
### MEANS FOR EXECUTION OF THE PLAN

8.1     **The Effective Date.**   On the Effective Date all required payments and transfers of property shall be made to holders of Allowed Administrative Claims, Allowed Tax Claims and Allowed Priority Claims. On the Closing Date all required payments and transfers of property shall be made to holders of Class 2, 3, 4, 5 and 6 Allowed Secured Claims. The payments will be made from cash proceeds generated from the sale of the Debtor's assets to NEWCO. The cash proceeds of the sale representing the distribution amount for Class 7 will be transferred on the Effective Date to the non-interest-bearing attorney trust account of Coan, Lewendon, Gulliver & Miltenberger, LLC. Within ninety days after the Effective Date, said counsel to the Official Committee of Unsecured Creditors shall make Pro Rata distributions of the Initial Distribution to the holders of Allowed Unsecured Claims.

8.2     **Sale of the Business to NEWCO.**   All of Debtor's right, title and interest in and to all real property and personal property including the Intangibles (but excluding its interest in Washex, Inc. and Causes of Action) will be sold free and clear of liens to NEWCO for the gross sum of $3,300,000.00 or such higher amount that may be generated from the Auction under the Sale Procedures Order, attached to the Disclosure Statement as EXHIBIT B. A copy of the Asset Purchase Agreement ("APA") is attached to the Disclosure Statement as EXHIBIT B-1 and is made a part hereof. As part of the sale to NEWCO, NEWCO will assume Debtor's current liabilities incurred in the ordinary course of business, but excluding any tax liabilities, product liabilities, liabilities for breach of contract, liabilities under environmental and similar laws, liabilities for breaches of product warranties or similar liabilities reflected thereon. NEWCO will not assume, the sale will be free and clear of, and Debtor will retain, pay, discharge and perform, in full, all other debts, obligations and liabilities of Debtor, known or unknown, fixed, contingent or otherwise, arising out of, or resulting from, Debtor's ownership or operation of its business or the acquired assets prior to the closing, or otherwise in accordance with the Plan. Any litigation involving the mark "LAVATEC" may be taken over by NEWCO at its option; but NEWCO shall not assume any liabilities of the Debtor arising out of or relating to such litigation. NEWCO may assume, in its sole and absolute discretion, any payments to administrative creditors that have not otherwise been satisfied under the Plan. If Laundry Acquisition Inc. remains the successful purchaser after the auction under the Sale Procedures Order, the Debtor's estate shall receive from NEWCO $3,300,000.00 or such higher amount that results from the Auction under the Sale Procedures Order. Said funds will be disbursed to Classes 1, 2, 3, 4, 5 and 6, reserved for and paid when allowed to Administrative Claims, and $100,000 disbursed to Class 7.

8.3     **Higher and Better Offers.** The Sale to NEWCO is subject to higher and better offers pursuant to procedures, including the requirement of a deposit for any bidder other than Laundry Acquisition Inc., as reflected in the Sale Procedures Order attached to the Disclosure Statement as Exhibit B. In the case where Laundry Acquisition Inc. remains the highest and best bidder, the assets of the Debtor will be sold to Laundry Acquisition Inc. in the manner provided for under this Plan and for the revised purchase price, if any, and according to the terms and conditions of the executed APA. In the case where Laundry Acquisition Inc. is not the highest and best bidder, the

8

assets of the Debtor will be sold to the successful bidder in the manner provided for under this Plan and for the new purchase price and according to the terms and conditions of an executed APA with the successful bidder. In the case where the sale price to NEWCO is greater than $3,500,000.00 and Laundry Acquisition Inc. is not the successful bidder, the break-up fee approved by the Sale Procedures Order shall be paid to Laundry Acquisition Inc. at the time the sale to the successful bidder is consummated. The Debtor's estate shall in all cases, receive from NEWCO the new purchase price. The difference between the new purchase price and $3,300,000.00 is referred to as the "Overbid Amount". The Debtor's estate shall receive one-half of the Overbid Amount remaining after payment of the break-up fee of $100,000.00 and the balance of the Overbid Amount will be paid to Wachovia Bank's Class 2 and Class 3 Claims until those Classes are paid in full. The Plan Sponsors will reserve from the estate's portion of the Overbid Amount such funds as are necessary in the judgment of the Plan Sponsors to satisfy both Priority Claims and Administrative (both existing and projected) Claims and the balance of the estate's portion of the Overbid Amount will be disbursed to Class 7. The balance of the purchase price will be distributed as provided in Section 8.2 of this Plan (i.e. disbursed to non-classified creditors, Classes 1, 2, 3, 4, 5 and 6, reserved for and paid when allowed to Administrative Claims, and $100,000 disbursed to Class 7). If any deposit is forfeited under the Sale Procedures Order it shall be treated and disbursed in the same manner as the Overbid Amount.

8.4    **Closing**. The Closing on the sale to NEWCO shall take place as soon as practicable after entry of the Confirmation Order, and in no case later than 15 Business Days after the Confirmation Order has become a Final Order, provided, however, that such date may be extended by up to ten (10) days by the Plan Sponsors and NEWCO upon mutual agreement.

8.5    **Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, the sale of any assets contemplated at or contemporaneously with the closing issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Debtor's Common Stock, any merger agreements, or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. All transactions contemplated herein shall be exempt from any such tax.

8.6    **Designation by the Debtor**. The Debtor designates Herman Bernstein and Peter Thompson (current officers of the Debtor) to assist counsel to the Debtor and counsel to the Official Committee of Unsecured Creditors with all post-confirmation obligations under the Plan and Herman Bernstein and/or Peter Thompson are further designated as fiduciaries of the Debtor's estate to take all actions and execute all documents required to effect the transactions described in this Plan, including the sale to NEWCO.

8.7    **Causes of Action**. The Debtor and/or Official Committee of Unsecured Creditors, acting by counsel, shall be vested after Confirmation with the right and power to commence or continue in the name of the Debtor and on behalf of the estate all Causes of Action or proceedings necessary or desirable to recover or liquidate property or debts, to prosecute litigation and to assert any other claims. Further orders of the Bankruptcy Court will not be necessary after Confirmation in order to confer such rights and powers on the Debtor and/or Official Committee of Unsecured Creditors. All net recoveries, if any, under this Section shall be distributed, pro rata, to Allowed Unsecured Claims and to the Wachovia Subordinated Claim in accordance with Section 6.5, after appropriate reserve for all present and projected Administrative Claims.

8.8    **Compromise and Abandonment**. The Plan Sponsors shall have the joint authority, at their discretion, to: compromise any causes of action vested in the Debtor and any matter relating

to the Debtor or its property or assets in the manner and upon the notice prescribed by Rule 9019 of the Federal Rules of Bankruptcy Procedure which notice maybe limited and reduced with Court Approval as allowed by the Rules; and abandon any asset or property of the Debtor that the Plan Sponsors conclude in their sole discretion is burdensome to the Debtor, is of inconsequential value to the Debtor or cannot be effectively prosecuted or pursued because of inadequacy or insufficiency of funds available for such purpose. Notice shall be given as prescribed by Federal Rule of Bankruptcy Procedure 6007.

8.9     **Professionals.**   The professionals retained herein pursuant to orders of the Bankruptcy Court during the proceeding shall continue to serve pursuant to such appointments, with fees subject to appropriate application and approval, subsequent to Confirmation.

## ARTICLE IX
## TERMS GOVERNING DISTRIBUTIONS

9.1     **Distributions by the Plan Sponsors.**   The Plan Sponsors shall reserve and distribute Cash and other assets of the Debtor and this estate in accordance with the provisions of this Plan. Counsel to the Official Committee of Unsecured Creditors shall be responsible for determining the Pro Rata distribution to which each Class 7 Creditor is entitled and for determining the dates upon which such payments are to be made. The Plan Sponsors shall make distributions as often as in their discretion and judgment there is an amount of funds sufficient to make a meaningful distribution to holders of Allowed Claims.

9.2     **Last Known Address**. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected for such holder on the Schedules.

9.3     **Returned Distributions**. Under the Plan, if (i) any distribution made to the holder of any Claim is returned as not deliverable, and such holder fails to notify counsel to the Official Committee of Unsecured Creditors of a proper address before 60 days after the distribution date, or any distribution check remains uncashed for more than 60 days after the date of the check, then the holder of such Allowed Claim shall be deemed to have waived (a) its Allowed Claim, and (b) all rights to any further distribution under this Plan. During such 60 day period, counsel for the Official Committee of Unsecured Creditors shall make a good faith effort to discover a proper address for the holder of such Allowed Claim, and to contact such entity and failing that such distribution will revert to the Debtor at the expiration of one year from the Effective Date.

9.4     **Setoff or Recoupment**. The Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim it may have against such claimant.

9.5     *De Minimis* **Distribution.** The distributors of funds pursuant hereto shall not be obligated to distribute any payment less than or equal to $5.00.

## ARTICLE X
## TERMS GOVERNING DISPUTED CLAIMS

10.1    Objection to Claims/Disputed Claims. Objections to Claims, if any, with the exception of any Claim to which an objection may be filed under Bankruptcy Code section 502(d) (as to which

10

Claims an objection need not be filed within the time period set forth hereinafter), shall be filed with the Bankruptcy Court and served upon each holder of a Disputed Claim no later than the sixtieth day following the Confirmation Date.  Except as otherwise set forth herein, objections which are not filed within such sixty (60) day period following the Confirmation Date are barred, precluded and may not be raised.  With respect to any Claim for which no objection is filed within such time, such Claim shall be deemed an Allowed Claim for the amount specified in a timely filed proof of claim with respect to such Claim, or, if no timely filed proof of claim exists, in the amount specified in the Schedules, unless the Claim was specified in the Schedules as being disputed, contingent or unliquidated.  If no timely filed proof of claim exists, and the Claim was specified in the Schedules as being disputed, contingent or unliquidated, the Claim shall be barred and no distribution made thereon pursuant to Bankruptcy Code section 1111(a) and Bankruptcy Rule 3003(c)(2).  With respect to any Claim to which a timely objection (which shall expressly be deemed to include any application, motion or complaint seeking subordination of a Claim) is filed (i.e., a "Disputed Claim"), no distribution shall be made to the holder of any such Disputed Claim until the entry of a Final Order or judgment determining the allowed amount of such Disputed Claim.  Pending the time of such Final Order or judgment, to the extent that any sum otherwise becomes payable to the holders of Claims of the class to which the Disputed Claim belongs, there shall be reserved by the Debtor an amount equivalent to that amount which would be payable to the holder of the Disputed Claim in the event that such Disputed Claim were allowed in the full amount asserted. Upon final determination of the allowed amount of the Disputed Claim, payment will be made to the holder of the Disputed Claim to the extent necessary to pay the same percentage of the allowed amount of such Claim as has been paid to Allowed Claims in said Class, without interest or any other accretions.

## ARTICLE XI
## CONDITIONS PRECEDENT

11.1    **Conditions to Consummation**. The Plan shall not be consummated unless and until the following conditions have been satisfied or waived in accordance with Article XI of this Plan:

(a)    The Confirmation Order, in form and substance satisfactory to the Plan Sponsors and NEWCO has been entered on the docket maintained by the Clerk of the Bankruptcy Court; and

(b)    All conditions in the Asset Purchase Agreement with Newco must be satisfied or waived;

11.2    **Waiver**.  The conditions precedent in Section 11.1(b) hereof may be waived, in whole or in part, by NEWCO and to the extent applicable by the Plan Sponsors. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action.

## ARTICLE XII
## EFFECT OF CONFIRMATION

12.1    **Binding Effect**. Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

12.2    **Exculpation**. As of the Confirmation Date, the Plan Sponsors and their Representatives shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The Debtor, the Official Committee of Unsecured Creditors, and each of their

11

respective Representatives shall have no liability to any holder of any Claim or Equity Interest or any other person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Reorganization Case, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the offer and issuance of any securities under the Plan, any sale of assets contemplated in the plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a Final Order and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

12.3    **Releases**.  For good and valuable consideration, including, but not limited to, the distributions to be made under the Plan, and the services of the Official Committee of Unsecured Creditors, and the efforts of each counsel to the Plan Sponsors to facilitate this Plan, effective as of the Effective Date, the current officers of the Debtor holding office as of the Effective Date, each member of the Official Committee of Unsecured Creditors and counsel to the Plan Sponsors (hereinafter each a "Releasee") is hereby released by the Debtor and its estate from any and all claims, debts, obligations, rights, suits, damages, actions, causes of actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, directly or indirectly arising from or related to the Debtor, existing as of the Effective Date or thereafter arising, in law, at equity, or otherwise, that the Debtor held, holds or may hold or that any creditors of the Debtor, any persons who have held, hold or may hold any Claim or Equity Interest, or any other person would have been legally entitled to assert on behalf of the Debtor or its estate, based in whole or in part upon any act or omission, transaction, agreement, event, or any other occurrence taking place on or before the Effective Date, including without limitation, claims, actions, and causes of action arising from actions taken or not taken in good faith in connection with the Plan of the Debtor and other transactions contemplated by this Plan; provided, however, that nothing herein shall be deemed to release any rights, claims, or interests that any such party may be receiving or retaining pursuant to the Plan on or after the Effective Date. All persons shall be precluded and permanently enjoined from asserting against the Releasees, and their respective assets and properties, any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever which are released under this Section 12.3. Any person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator. Nothing in this Plan shall be deemed to or construed to release former officers, directors, shareholders and employees of the Debtor (i.e. persons or entities that are not officers, directors, shareholders and/or employees as of the date of the filing of this Plan) and nothing in the Plan shall impair or otherwise alter or affect Wachovia Bank, N.A.'s rights, claims or remedies with respect to Samir Tadros.

12.4 **Causes of Action**.  Effective as of the Effective Date, unless any Causes of Action are settled prior to the Confirmation Date with bankruptcy court approval, all Causes of Action shall remain valid and enforceable by any one of the Plan Sponsors for the benefit of Class 7 claimants and to pay professional expenses.

**ARTICLE XIII**
**RETENTION OF JURISDICTION**

13.1 **Jurisdiction**.  Notwithstanding the Confirmation of the Plan or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)          to take any action to resolve any disputes arising out of or relating to any Claim or any equity security interest; to determine other issues presented by or arising under the Plan; and to take any action to resolve any dispute of any creditor with respect to its Claim;

(2)          to construe and to take any action to enforce the Plan, issue such orders as may

12

be necessary for the implementation, execution and consummation of the Plan, and determine all other matters which may be pending on the Confirmation Date;

(3)          to determine any and all applications for allowance of compensation;

(4)          to determine any and all applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or assignment of executory contracts and the allowance of any Claim resulting therefrom;

(5)          to determine all Causes of Action, applications, adversary proceedings, contested matters and other litigated matters pending on or filed after the Confirmation Date;

(6)          to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(7)          to modify the Plan, or to remedy any apparent non-material defect or omission in the Plan, or to reconcile any non-material inconsistency in the Plan so as to carry out its intent and purposes;

(8)          to adjudicate all Claims as to a security or ownership interest in any property of the Debtor or in any proceeds thereof; and

(9)          to determine (i) all matters and disputes arising out of or in any way relating to the Auction, as defined in the Sale Procedures Order, and (ii) all matters and disputes arising out of or in any way relating to the transactions contemplated by this Plan.

### ARTICLE XIV
### MISCELLANEOUS

14.1   **Governing Law.**   Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by, and construed in accordance with, the laws of the State of Connecticut.

14.2   **Headings.**   The headings of the Articles, paragraphs, and sections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

14.3   **Defects, Omissions and Amendments.**   The Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and interests, insofar as it does not materially and adversely affect the interest of holders of Claims and holders of interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the execution of the Plan.  The Plan may be altered or amended before or after Confirmation, as provided in Bankruptcy Code Section 1127, if in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims and holders of interests.  The Plan may be altered or amended before or after Confirmation in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims and holders of interests, after a further hearing and acceptance of the Plan as so altered or modified as provided in Bankruptcy Code section 1127.

14.4   **Severability.**   Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

14.5   **Computations.**   Any calculation of days shall be in accordance with Bankruptcy Rule 9006.

13

**14.6     Miscellaneous Rules of Construction.**  (1) The words "herein," "hereof," "hereunder," and other words of similar import refer to this Plan as a whole, not to any particular section, subsection or clause, unless the context requires otherwise; (2) whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, or neuter; (3) accounting terms not otherwise defined in this Plan shall have the meanings assigned to them under generally accepted accounting principles currently in effect; and (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order.

14.7     **Plan Sponsors**.  Any reference to one or both of the Plan Sponsors means for purposes of the Plan any one of the Plan Sponsors and in the case that a Plan Sponsor is disqualified, resigns, withdraws or can no longer be considered a Plan Sponsor, the remaining Plan Sponsor shall be deemed to have sponsored this Plan and have assumed the obligations attributable to a the Plan Sponsors.

14.8     **Confirmation Order and Plan Control.**  To the extent the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, the Plan controls the Disclosure Statement, and the Confirmation Order (and any other orders of the Bankruptcy Court) control the Plan.

14.9     **Successors and Assigns.**  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such Person or Entity.

14.10     **Effectuating Documents and Further Transactions.**  Herman Bernstein and or Peter Thompson are authorized and directed as fiduciaries of the Debtor's estate to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

Dated at New Haven, Connecticut this 8th day of April 2011.

**Lavatec, Inc.**

By: /s/  Herman Bernstein
Name: Herman Bernstein
Its: President

By:  /s/   Dean W. Baker
Dean W. Baker, Esq.
Law Offices of Dean W. Baker
195 Church Street, Floor 8
New Haven, CT 06510
(203) 777-5666
dean@bohonnon.com

14

**The Official Committee of Unsecured Creditors**

By: /s/  Honor S. Heath
Name: Honor S. Heath, Esq.
Its: Chairman

By:  /s/   Carl T. Gulliver
Carl T. Gulliver, Esq.
Coan, Lewendon, Gulliver & Miltenberger, LLC
495  Orange Street
New Haven, CT  06511
(203) 624-4756
cgulliver@coanlewendon.com

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | |
|---|---|
| In re:<br><br>　　　LAVATEC, INC.<br><br>　　　　　Debtor | Chapter 11<br>Case No. 09-32004 (LMW) |

**ORDER**
**(A) AUTHORIZING AND APPROVING FORM OF "STALKING HORSE"**
**AGREEMENT, BIDDING PROCEDURES AND BREAK-UP FEE,**
**(B) SCHEDULING AN AUCTION AND HEARING, AND**
**(C) GRANTING RELATED RELIEF, ALL IN CONNECTION**
**WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**

The Court having considered the Debtor's Motion for Order (A) Authorizing and Approving Form of "Stalking Horse" Agreement, Bidding, Notice and Hearing Procedures and Break-up Fee, (B) Scheduling an Auction and a Hearing, and (c) Granting Related Relief, All in Connection with the Sale of Substantially All of the Debtor's Assets (the "Sale Procedures Motion"); and

The Court having considered any arguments made and any evidence presented at the hearing; and

The Court having considered any objections made to the Sale Procedures Motion; and It appearing that there is good cause to grant the Sale Procedures Motion; it is

**ORDERED**, that the Sale Procedures Motion is granted; and it is further

**ORDERED**, that any objections made to the Sale Procedures Motion are overruled; and it is further

**ORDERED,** that the form and provisions of the "Stalking Horse" Agreement (hereinafter the "APA") annexed as **Exhibit B-1** are fair and reasonable and are hereby approved; and it is further

**ORDERED**, that the following procedures (the "Bidding, Notice and Hearing Procedures") are approved and govern the process, including an auction to be held, by which the Plan Sponsors will consider and accept offers for the sale of the Debtor's assets.

a.     <u>Sale of Property</u>: The Plan Sponsors have filed a plan that proposes to sell

1

substantially all assets of the Debtor (as described in the APA) to NEWCO or the highest and best bidder (the "Plan"). A hearing will take place at the time of the confirmation hearing ("Confirmation Hearing") on the Plan, as established herein, to determine the highest and best bidder.

b.   Qualified Bids: To constitute a qualified bid (a "Qualified Bid") and be considered, a Bid shall:

(i)   Writing: Be submitted in writing to Dean W. Baker, 195 Church Street, Floor 8, New Haven, Connecticut 06510, with a copy to Carl T. Gulliver at Coan, Lewendon, Gulliver & Miltenberger, LLC., 495 Orange Street, New Haven, CT 06511 not later than 5:00 p.m. (EST) on _____ __, 2011 (the "Bid Deadline").

(ii)   Value of Bid: Be a proposal that the Plan Sponsors determine, in good faith, is not materially more burdensome to the estate than the terms of the APA and such bid must include a cash bid that is non-contingent consideration in an amount of at least $200,000.00 greater than the Qualified Bid of NEWCO ("NEWCO") made pursuant to an executed APA attached hereto as **Exhibit B-1.** The Qualified Bid of NEWCO is $3,300,000.00. Accordingly, a Qualified Bid must be in an amount of at least $3,500,000.00; must be payable in cash or certified or bank check or by wire; and no Qualified Bid shall be conditioned on due diligence and/or a financing contingency. Any bidder that submits a Qualified Bid must also sign a confidentiality agreement in the form of **Exhibit B-2**, prior to obtaining a bid package that the Debtor will make available to interested bidders.

(iii)   Purchase Contract:   Include delivery of a completed duplicate signed, witnessed and acknowledged sales contract ("Purchase Contract") that is identical or substantially similar to the executed APA (any Purchase Contract must include, inter alia, a provision that is identical to Section 5.8 of the APA which confirms that the bidder/buyer will be the "Certifying Party" under the "Transfer Act" as those terms are defined and described in Section 5.8) attached hereto as **Exhibit B-1** and contain no contingencies.

(iv)   Deposit and Financial Resources: Be accompanied by (x) a deposit in the amount of $175,000.00 (the deposit plus all accrued interest is the "Deposit") in the form of a certified or cashier's check drawn upon a Connecticut bank payable to Carl T. Gulliver, Trustee and (y) statements and/or documents establishing that the bidder (Prospective Bidder) has the financial resources and ability to consummate its Purchase Contract. The Deposit of the High Bidder (as

2

hereinafter defined) and Backup Bidder (as hereinafter defined) shall be deposited by in said counsel's non-interest bearing trust account unless the closing is stayed by order of the Court or of the United States District Court, in which case said funds will be transferred to an interest bearing account. The High Bidder's Deposit shall be forfeited, in accordance with its Purchase Contract, if the High Bidder fails to proceed and complete the closing within fifteen (15) business days after the Confirmation Order becomes a Final Order as those terms are defined by the Plan. If the Backup Bid becomes operative by virtue of the High Bidder's default, the Backup Bidder's Deposit shall be forfeited, in accordance with its Purchase Contract, if the Backup Bidder fails to proceed and complete the closing within five (5) days of written notice from any one of the Plan Sponsors that the Backup Bid has become operative.

c.    <u>No Other Qualifying Bids</u>:  If the Plan Sponsors do not receive any Bids (other than the Bid already received from NEWCO) that satisfy the provisions set forth in paragraph b above, the Plan Sponsors will report the same to the Bankruptcy Court at the time of the Confirmation Hearing and the Plan Sponsors will seek the Bankruptcy Court's approval of the sale to NEWCO pursuant to the terms of the Plan.

d.    <u>Auction Procedures</u>: If the Plan Sponsors receive a Bid or Bids that satisfy the provisions set forth in paragraph b above, the Plan Sponsors will conduct an auction for sale of Debtor's assets ("Auction") as described in the APA and the Plan at the time of the Confirmation Hearing on _____ , 2011 at        a.m., in the United States Bankruptcy Court, 157 Church Street, 18th Floor, New Haven, Connecticut. All Qualified Bids will be able to bid at the Auction. The APA as executed by NEWCO shall constitute a Qualified Bid for purposes of participating in the Auction. Each Qualified Bid shall remain obligated on its Purchase Contract submitted as part of its Qualified Bid, subject to the outcome of the Auction. The Auction shall be open live bidding to be conducted by the Plan Sponsors. The Plan Sponsors may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding, Notice and Hearing Procedures. The floor Bid at the Auction must be in amount of at least $3,500,000.00 and any subsequent Bid at the Auction shall be in overbid increments of at least $100,000.00 of additional cash only. The Auction shall proceed and continue until the highest bid is determined (the "High Bid") by the Plan Sponsors. At such time, the proponent of the High Bid (the

3

"High Bidder") shall be obligated to immediately amend its previously executed Purchase Contract to insert the High Bid as the sales price, and initial said amendment. Herman Bernstein and/or Peter Thompson, on behalf of the Debtor's Estate, shall then execute the High Bidder Sales Contract, as amended and signed by the High Bidder, and shall retain one of the Purchase Contracts and the Deposit shall be turned over to Carl T. Gulliver, Esq., Trustee.  Simultaneously, the second-highest bidder at the Auction (the "Backup Bidder") shall be determined by the Plan Sponsors and the Backup Bidder shall be obligated to immediately amend its Purchase Contract (the "Backup Contract"), inserting the amount of its second-highest bid as a sales price, and a provision stating that the Backup Bidder is obligated on the Backup Contract in the event of a default by the High Bidder in accordance with this Order. The Backup Bidder must initial those changes to its Purchase Contract. Herman Bernstein and/or Peter Thompson, on behalf of the Debtor's Estate, shall then execute the duplicate Backup Contracts and retain one and the Deposit shall be turned over to Carl T. Gulliver, Esq., Trustee. All other Deposits shall be immediately returned to all other bidders**. Upon consummation of a sale to the High Bidder, the Backup Bidder's Deposit shall be returned to the Backup Bidder. PRIOR TO THE AUCTION, THE PLAN SPONSORS SHALL HAVE THE RIGHT TO ADJUST THE PROCEDURES SET FOR CONDUCTING THE AUCTION AND A FORM OF THE PURCHASE CONTRACTS AS CIRCUMSTANCES MAY REQUIRE IN THE PLAN SPONSORS' SOLE DISCRETION.**

e.      All Cash Transaction: All Deposits are required to be on an all-cash basis, in the form of a bank or certified check. The funds for completion of the Closing (defined below) must similarly be delivered by bank or certified check, such closing funds to be drawn on a Connecticut bank.

f.      Access to the Property: The Debtor's assets are open for inspection during normal business hours, with all appointments to be scheduled with Peter Thompson, by calling the company.

g.      Sale "As Is" and Without Representations: The sale of the Debtor's assets is on an "As Is, Where Is, With all Faults" basis, without representations, warranties, promises or guaranties of any kind by the Plan Sponsors or any of their agents, attorneys or consultants, including without limitation all environmental matters.

h.      Sale Free and Clear: The ultimate purchaser approved by the Court (the "Purchaser") shall be entitled, as a condition of Closing, to receive the Property free and clear of all

4

liens, encumbrances and interests pursuant to and subject to any limitations set forth in the APA or the Plan.

   i.  <u>Closing Date</u>: The Purchaser's completion of the sale must occur within fifteen (15) business days after the Confirmation Order becomes a Final Order as those terms are defined in the Plan.

   j.  <u>Bankruptcy Court Approval of Auction and Sale</u>: The Plan Sponsors shall ask the Court to approve the sale under the Plan to the High Bidder at the time of the Confirmation Hearing. The Confirmation Hearing and Auction may be continued to a later date without notice except in open court and the High Bidder and Backup Bidder shall continue to be bound during any such continuance period.

   k.  <u>Core Jurisdiction</u>: All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and the sale of the Debtor's Property; and it is further

   **ORDERED**, that NEWCO shall be allowed a Break-up Fee in the amount of $100,000.00 payable only in the event that a sale of substantially all or a significant portion of the Debtor's assets are sold to an entity other than NEWCO in which case the Break-up Fee shall be paid to NEWCO at the time of the closing of such sale from the proceeds of such sale.

Exhibit B-1
(APA)

Exhibit B-2
(Confidentiality Agreement)

**EXHIBIT B-1**

<u>ASSET PURCHASE AGREEMENT</u>

between

LAUNDRY ACQUISITION INC.

and

LAVATEC, INC.

Dated as of April 8, 2011

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is dated as of April 8, 2011, by and between Laundry Acquisition, Inc,, a Connecticut corporation  ("Purchaser"), and Lavatec, Inc., a Connecticut corporation that is a Debtor in Possession in chapter 11 under the Bankruptcy Code ("Seller").  In consideration of the mutual covenants, agreements and warranties herein contained, the parties hereto agree as follows:

## CERTAIN DEFINITIONS

Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" is defined in Section 1.1.

"Acquisition Proposal" means a proposal to acquire all or substantially all of the Acquired Assets and to assume the Assumed Obligations.

"Agreement" means this Asset Purchase Agreement, including all Exhibits and Schedules hereto, as it may be amended from time to time in accordance with its terms.

"Alternative Transaction" means a transaction contemplated by an Acquisition Proposal made by a Third Party.

"Alternative Transaction Deadline" means the date which is fifteen (15) business days  after the Confirmation Order becomes a Final Order.

"Assumed Contract"  the meaning set forth in Section 1.1(k).

"Assumed Obligations" is defined in Section 1.3.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. sections 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Connecticut.

"Break-up Fee" means the sum of $100,000.

"Cash" means cash and cash equivalents, including marketable securities and short term investments.

"Chapter 11 Case" means the pending case commenced by Seller under chapter 11 of the Bankruptcy Code.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article XIII hereof.

"Closing Date" means the date on which the Closing occurs or is to occur.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confirmation Hearing" is defined in Section 8.1.

"Confirmation Hearing Date" is the date on which the Bankruptcy Court confirms the Plan.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code §1129.

"Consent" means a consent, approval, authorization, waiver or notification from any governmental authority or other Person necessary to authorize, approve or permit the full or complete sale, conveyance, assignment, sublease or transfer of the Acquired Assets and to consummate and make effective the transaction contemplated by this Agreement, except to the extent any of the foregoing is not required pursuant to an order of the Bankruptcy Court.

"Current Assets" means all of the following owned by the Seller: (i) Current Accounts Receivable, plus a maximum of $30,000 of accounts receivable of the Seller which are outstanding for a period in excess of 60 days from the sooner of the date of the sale of goods or the issuance of an invoice for rendering of services in accordance with the contract or purchase order relating thereto or the due date of the rental payment for the lease of inventory in accordance with the terms of such lease; (ii) Cash; (iii) current parts and related items (i.e. parts and related items which are currently used in the assembly or repair of the Seller's end products or finished goods inventory); (iv) work-in-process inventory of the Seller which is good and usable current inventory; (v) current prepaid parts which have not been received by Seller from a third party vendor and which are to be used in the assembly or repair of the Seller's end products; (vi) current, good and usable raw materials; (vii) finished goods inventory of the Seller which is good and usable current inventory; (viii) the total value of "obsolete inventory" as shown on Schedule 2.3 hereto, minus an "inventory reserve" of $860,000 as shown on Schedule 2.3 hereto; and (ix) any deposit owned by the Seller and which is refundable to the Seller and may be transferred to the Purchaser on or prior to the Closing with respect any insurance policy under which the Seller is the insured party, or any deposit by the Seller as a customer with United Parcel Service of America, Inc.

"Current Assets Count" the meaning set forth in Section 2.3.

"Current Accounts Receivable": means accounts receivable of the Seller which: (i) is not subject to any offsets, contraclaims, counterclaims, deductions, disputes, or discounts of any nature; (ii) represents bona fide indebtedness owed to Seller of account debtors for items of inventory sold and actually shipped and unconditionally accepted by the account debtor and/or the rendition of services in the Seller's ordinary course of business and as to which the delivery of such items of inventory or the rendition of such services has been completed; (iii) relates to inventory sold or leased to the account debtor or debtors or the service rendered to the account

-2-

debtor or debtors which gave rise to the account receivable have not  been sold on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or other repurchase or return basis and such inventory has, or will have, actually been shipped and  conforms or will conform to the contracts creating such account receivable and has not been rejected; and (iv) has not been outstanding for a period in excess of 60 days from the sooner of the date of the sale of goods or the issuance of an invoice for rendering of services in accordance with the contract or purchase order relating thereto or the due date of the rental payment for the lease of inventory in accordance with the terms of such lease.

"Customer Orders" is defined in Section 1.1(e).

"Deposit" has the meaning set forth in Section 2.1.

"Disclosure Statement" means that certain Disclosure Statement, as amended from time to time, filed by the Plan Sponsors in the Chapter 11 Case.

"Disclosure Statement Hearing Date" is the date on which the Bankruptcy Court approves the adequacy of the Disclosure Statement.

"Dollars" or "$" means dollars of the United States of America.

"Domain Names"  means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek certiorari or review has expired and as to which no appeal or petition for certiorari or review is pending or as to which any right to appeal or to seek certiorari or review has been waived.

"Intellectual Property" means  (a) all trade secrets and confidential business information (including customer and supplier lists, ideas, sales records, business data, research and development, know-how, formulas, compositions, and techniques, technical data (including, without limitation, any customized or specialized data or specifications), designs, drawings, specifications, pricing and cost information, and business and marketing plans and proposals), (b) all trademarks, including, without limitation, the mark "Lavatec," service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions,  and reexaminations thereof, (d) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (e) all mask works and all applications, registrations, and renewals in connection therewith, (f) all Software  (including data and related documentation), (g) all other proprietary rights, (h) all

-3-

copies and tangible embodiments thereof (in whatever form or medium), and  (i) all Domain Names.

"Inventory" is defined in Section 1.1(a).

"Lien" means any security interest, lien, charge, mortgage, deed, assignment, pledge, hypothecation, encumbrance, easement, restriction or interest of another Person of any kind or nature.

"Losses" means all liabilities of every kind, losses, costs, claims, judgments, awards, damages (including punitive, consequential and multiple damages), penalties or expenses (including reasonable attorneys' fees and expenses and costs of investigation and litigation), and also including any expenditures or expenses incurred to cover, remedy or rectify any such Losses.

"Material Adverse Change" means a material adverse change in the properties, assets, condition (financial or otherwise), business, operations or prospects of the Seller, taken as a whole, since December 31, 2010, other than any consequence directly related to the Chapter 11 case.

"Object Code"  means computer software that is substantially or entirely in binary form and that is intended to be directly executable by a computer after suitable processing and linking but without any intervening steps of compilation or assembly.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any court or other governmental authority.

"Overbid Auction" is defined in Section 8.1.

"Owned Real Property" is defined in Section 1.1(g).

"Person" means any corporation, partnership, joint venture, organization, entity, authority or natural person.

"Plan" means that certain Plan of Liquidation, as amended from time to time, filed by the Plan Sponsors in connection with Chapter 11 Case.

"Plan Sponsors" means the Seller and the Official Committee of Unsecured Creditors, as plan proponents, in the Chapter 11 Case.

"Purchase Price" is defined in Section 2.1.

"Rejected Contracts" is defined in Section 1.2(c).

"Sale Procedures Approval Date" is defined in Section 5.2.

"Sale Procedures Motion Date" is defined in Section 5.2.

"Sale Procedures Order" is defined in Section 5.2.

"Seller Contract" means any contract to which the Seller is a party, obligor or beneficiary or by which any of the properties and assets of the Seller is bound, including, without limitation, leases, purchase orders or other contracts to which the Seller is a party.

"Seller Purchase Orders" is defined in Section 1.1(d).

"Software" means all computer software and code, including assemblers, applets, compilers, Source Code, Object Code, development tools, design tools, user interfaces and data, in any form or format, however fixed.  For purposes of this Agreement, Software includes all software that is in the development, transition or similar phase.

"Source Code"  computer software that may be displayed or printed in human readable form, including all related programmer comments, annotations, flowcharts, diagrams, help text, data and data structures, instructions, procedural, object oriented or other human readable code, and that is not intended to be executed directly by a computer without an intervening step of compilation or assembly.

"Taxes" means all taxes, charges, fees, duties, levies or other assessments, including without limitation, income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, license, payroll, unemployment, environmental, customs duties, capital stock, disability, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational and interest equalization, windfall profits, severance and employees, income withholding and Social Security taxes imposed by the United States or any other country or by any state, municipality, subdivision or instrumentality of the United States or any State or of any other country or by any other tax authority, including all applicable penalties and interest, and such term shall include any interest, penalties or additions to tax attributable to such Taxes.

"Tax Return" means any report, return or other information required to be supplied to a taxing authority in connection with Taxes.

"Third Party" means any Person other than Seller, Purchaser or any of their respective affiliates.

"Topping Offer" is defined in Section 8.1.

"Trademark Dispute" the meaning set forth in Section 5.7.

"Transaction Deadline" means June 15, 2011.

# ARTICLE I

## PURCHASE AND SALE

1.1.  _Acquired Assets_.  Subject to the terms and conditions set forth in this Agreement at the Closing, Seller shall sell, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery of, all of Seller's right, title and interest in and to the following (all of the assets sold, assigned, transferred and delivered to Purchaser hereunder are referred to collectively herein as the "Acquired Assets"):

(a)    All of the Seller's raw materials, work in process and finished goods inventory as more fully described on Schedule 1.1(a) at the Closing Date (the "Inventory");

(b)    All supplies, fixtures, equipment and machinery listed on Schedule 1.1(b);

(c)    All Cash of the Seller and all accounts receivable incurred in the ordinary course that the Seller owns at the Closing Date and reflected on Schedule 1.1(c);

(d)    All of the unfilled purchase orders, and executory contracts and agreements for the purchase by Seller of goods, materials and services (i) existing at the date of this Agreement and set forth in Schedule 1.1(d) or (ii) entered into after the date of this Agreement and prior to the Closing Date that are on commercially reasonable terms and consistent with Seller's past practices and on conditions reasonably satisfactory to the Purchaser and subject to the foregoing, as set forth on Schedule 1.1(d) as supplemented in accordance with this Agreement prior to the Closing (collectively, the "Seller Purchase Orders");

(e)    All of the unfilled purchase orders, and executory contracts and agreements for the sale by Seller of goods and services and such other purchase orders, sales contracts and agreements with customers (i) existing at the date of this Agreement and set forth in Schedule 1.1(e) or (ii) entered into after the date of this Agreement and prior to the Closing Date that are on commercially reasonable terms and consistent with Seller's past practices and on conditions reasonably satisfactory to Purchaser, and subject to the foregoing, as set forth on Schedule 1.1(e) as supplemented in accordance with this Agreement prior to the Closing (collectively, the "Customer Orders");

(f)    The furniture, desks, file cabinets, storage and display racks, computer systems, phone systems and software of Seller listed on Schedule 1.1(f);

(g)    The real property owned by the Seller and improvements thereon and interests therein as described on Schedule 1.1(g) (the "Owned Real Property;)

(h)    All buildings, plants, facilities, installations, fixtures and other structures and improvements situated or located on the Owned Real Property;

(i)        All deposits and prepaid expenses made or paid to utility companies and the like, insurance companies under which the Seller is the insured, vendors or otherwise, including United Parcel Service of America, Inc., and including, without limitation, prepaid accounts for parts/inventory or other merchandise which have not been delivered as of the Closing Date,  together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, including recoverable deposits, including without limitation any of the foregoing set forth on <u>Schedule 1.1(i)</u>;

(j)        all Intellectual Property (other than any Intellectual Property that is or becomes an Excluded Asset under <u>Section 1.2 (j)</u>) owned by the Seller (including the rights to sue for (and remedies against) past, present and future infringements thereof, and rights of priority and protection of interests therein under applicable law), including without limitation the Intellectual Property set forth on <u>Schedule 1.1(j)</u>;

(k)        All Seller Contracts set forth on <u>Schedule 1.1(k)</u>, as such schedule may be amended, supplemented or modified after the date of this Agreement by the Purchaser pursuant to the terms of this Agreement (collectively, the "<u>Assumed Contracts</u>");

(l)        All licenses or permits held by the Seller (to the extent permitted by applicable law to be transferred) and listed on <u>Schedule 1.1(l)</u>;

(m)        the motor vehicles set forth on <u>Schedule 1.1(m)</u>, which constitute all motor vehicles of the Seller; and

(n)        to the extent not included in any of the foregoing, all Current Assets of the Seller.

1.2.        <u>Excluded Assets</u>.  The following assets of Seller, as well as any other assets not defined as Acquired Assets, shall be retained by Seller and are not being sold or assigned to Purchaser hereunder (collectively, the ""**Excluded Assets**"):

(a)        Any right of Seller under this Agreement (or under any other agreement between Seller and Purchaser entered into on or after the date of this Agreement);

(b)        Any Tax Returns, Tax books and Tax records;

(c)        The Seller Contracts that are not Assumed Contracts (collectively, the "<u>Rejected Contracts</u>"), which are set forth on <u>Schedule 1.2(c)</u>, as such schedule may be amended, supplemented or modified after the date of this Agreement by the agreement of the parties;

(d)        All causes of action that arise in favor of Seller and the bankruptcy estate pursuant to Chapter 5 of the Bankruptcy Code;

(e)        The Seller's corporate records;

(f)        any real property owned or leased by the Seller other than the Owned Real Property;

(g)        insurance policies, proceeds, claims and causes of action with respect to or arising in connection with (i) any contract which is not assigned to Purchaser at the Closing, or (ii) any item of tangible or intangible property not acquired by Purchaser at the Closing;

(h)        any letter of credit of similar financial accommodations issued to any third party for the account of the Seller;

(i)        books and records as to any Excluded Asset;

(j)        at the Purchaser's sole option, all of the Seller's right, title and interest to the "Lavatec" trademark  by the Seller.

1.3.   <u>Assumed Obligations</u>.  Purchaser shall, effective as of the Closing Date, assume, and agrees to satisfy and discharge as the same shall become due, only those liabilities and obligations of the Seller specifically described and quantified on <u>Schedule 1.3</u> (collectively, the "<u>Assumed Obligations</u>"), which items shall include post petition accounts payable of the Seller incurred in the ordinary course of the Seller's business.  Without limiting the foregoing, the Purchaser is not assuming (collectively, the "<u>Excluded Liabilities</u>"):

(a)        Any Losses or liabilities relating to any Rejected Contract;

(b)        Losses, liabilities, or obligations of the Seller for professional fees and expenses for its advisors, including, without limitation,. advisors retained pursuant to any Order of the Bankruptcy Court;

(c)        Any administrative expense claims accruing in the Chapter 11 Case, other than post petition accounts payable of the Seller incurred in the ordinary course of the Seller's business;

(d)        Losses or obligations of Seller arising under any and all existing contracts with its advisors  and consultants not otherwise constituting an Assumed Obligation or Assumed Contract;

(e)        Losses or obligations of Seller arising under any and all employment and change in control contracts, equity option contracts and equity purchase contracts to which Seller is a party other than any Losses arising pursuant to any Assumed Obligation or Assumed Contract;

(f)        Losses, liabilities, obligations, or amounts payable (pursuant to contract or otherwise) to any existing or former equity or stakeholder of Seller or in any way related to the right to or issuance of any equity interest of such Seller or any  predecessor or affiliate of such Seller including, without limitation, any options or warrants;

(g)        Losses or obligations in connection with or relating to the Excluded Assets;

(h)     any Losses of Seller for Taxes, including (A) any Taxes arising as a result of Seller's operation of its business or ownership of its assets prior to the Closing Date including all real property Taxes, (B) any Taxes that will arise as a result of the sale of the Acquired Assets, and (C) any deferred Taxes of any nature;

(i)     Losses or obligations in connection with any indebtedness or debt of Seller, except pursuant to any Assumed Contract;

(j)     Losses arising out of any litigation or other action pending against Seller or its affiliates as of the Closing Date or commenced after the Closing Date but arising out of or relating to any occurrence or event happening on or prior to the Closing Date, other than as directly arising pursuant to an Assumed Obligation or pursuant to any Assumed Contract;

(k)     Losses, liabilities or obligations in connection with the Rejected Contracts;

(l)     Losses, liabilities or obligations related to all insurance policies of Seller other than Losses arising pursuant to any Assumed Contract; or

(m)     Losses in connection with any product liabilities, liabilities for breach of contract, or Losses under any environmental or similar laws, or losses for any breaches of product warranties or similar Losses; or

(n)     any other Loss or liability of Seller not expressly assumed pursuant to Section 1.1.

1.4.    No Other Liabilities Assumed.  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume any debt, claim, or obligation or other liability of Seller, other than the Assumed Obligations.  In furtherance and not in limitation of the foregoing, neither Purchaser nor any of its affiliates shall assume, and shall not be deemed to have assumed, any debt, claim, obligation or other liability of Seller or any of its affiliates whatsoever other than as specifically set forth in Section 1.3.

1.5     Accounts Receivable.  Payments on any accounts receivable received by Seller after the Closing with respect any account receivable, shall be forwarded (within five (5) business days, and until so forwarded, shall be held in trust for the benefit of Purchaser) to Purchaser or retained by Purchaser, as applicable, along with the applicable remittance advice. The Purchaser shall gave the right to inspect all cash receipts of the Seller in order to confirm its compliance with the obligations imposed on it under this Section.

ARTICLE II

PURCHASE PRICE AND PAYMENT AND ADJUSTMENT

2.1.   Payment of Purchase Price and the Deposit.  On the Closing Date, Purchaser shall pay to Seller in full payment for the Acquired Assets the sum of $3,300,000 (the "Purchase Price"), which sum shall be  payable by certified or official bank check or wire transfer in immediately available funds, provided that $175,000, plus any interest thereon, shall be credited at Closing if the Purchaser has made the Deposit as set forth herein.  On the date of the Overbid Auction, the Purchaser shall is deposit via certified or official bank check or wire transfer the sum of $175,000 (the "Deposit") with Carl Gulliver, counsel to the Official Committee of Unsecured Creditors, the amount of which shall be applied against the Purchase Price as set forth above.  The Deposit shall be maintained in an interest bearing account pursuant to an escrow agreement among the Seller, Carl Gulliver, and the Purchaser.

2.2.   Physical Count.  On or promptly before the Closing Date, but in any event effective as of the Closing Date, Seller and Purchaser and/or their representatives shall complete, to Purchaser's reasonable satisfaction, a complete and accurate physical count and inspection of the Acquired Assets.

2.3   Purchase Price Adjustment. The Purchase Price has been agreed upon based upon the minimum level of Current Assets at the closing being in the amount of $2,300,000 (the "Current Assets Threshold").  On the day before the Closing Date, the Seller and Purchaser shall conduct an inventory and calculation of the Current Assets, which shall describe the items of Current Assets and the valuation thereof (the "Current Assets Count"); such Current Assets Count shall be detailed in writing and shall be executed by Purchaser and the Seller and delivered at the Closing and attached hereto as Schedule 2.3 and in the form as set forth on Schedule 2.3 attached hereto.  Based upon the Current Assets Count, the Purchase Price  shall be decreased by $1.00 for each $1.00 decrease in the level of Current Assets below the Current Assets Threshold.

2.4   Prorations.      To the extent that any of the items listed below relating to the business and operation of the Seller, the Acquired Assets and/or the Assumed Obligations are payable by Purchaser or the Seller after the Closing Date but relate, in whole or in part, to periods prior to the Closing Date, Seller and Purchaser, as the case may be, will make appropriate pro-rata adjustments such that Seller bears all such costs and expenses to the extent such items relate to any time period up to and including the Closing Date and Purchaser bears all such costs and expenses to the extent such items relate to any time period subsequent to the Closing Date: (a) personal property, real estate, occupancy and water taxes, if any, on or with respect to the business and operation of the Seller, the Acquired Assets and/or the Assumed Obligations; (b) taxes and other items payable by Seller under any Contract to be assigned to or assumed by Purchaser hereunder; (c) all other items which are normally prorated in connection with similar transactions (including customer prepayments and utility charges); and (d) customer rebate and accrual programs.  Seller and Purchaser agree to furnish each other with such

documents and other records as each party reasonably requests in order to confirm all adjustment and proration calculations made pursuant to this <u>Section 2.4</u>.

2.5     <u>Allocation</u>.  Not later than forty-five (45) days after the Closing Date, Purchaser shall prepare and deliver to Seller  a schedule (the "<u>Allocation Schedule</u>") allocating the Purchase Price, as adjusted, and among the various assets comprising the Acquired Assets and the Assumed Obligations in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. Such Allocation Schedule shall be controlling, absent manifest error.  Purchaser and Seller shall not report or file any tax returns (including any amended tax returns and claims for refund) in a manner which is inconsistent with such Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Notwithstanding any other provisions of this Agreement, the provisions of this section shall survive the Closing.

ARTICLE III

<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller represents and warrants to Purchaser as of the date of this Agreement and the Closing Date, as follows:

3.1.     <u>Due Authorization</u>.  The Board of Directors of Seller and/or the Bankruptcy Court has approved the entry of Seller into this Agreement and the transactions contemplated hereby.  Seller has full power and authority to enter into this Agreement and to carry out the transactions contemplated herein, and this Agreement has been duly and validly executed and delivered by Seller, and constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject, in each case, only to Bankruptcy Court approval.

3.2.     <u>Title to Acquired Assets</u>  At and as of the Closing Date, and subject only to Bankruptcy Court approval, Seller will have good and marketable title to, and will have the right to sell, convey, transfer, assign and deliver the Acquired Assets free and clear of any Lien and any right of first refusal.  At and as of the Closing Date, and subject only to Bankruptcy Court approval, Seller will convey the Acquired Assets to Purchaser by bills of sale, certificates of title and other instruments of assignment and transfer effective to vest in Purchaser, and Purchaser will have, good and valid marketable title to all of the Acquired Assets, free and clear of all Liens and rights of first refusal.  Notwithstanding the foregoing, Seller and Purchaser acknowledge that Seller's title to the trademark "Lavatec" is currently contested and the subject of the Trademark Dispute, as defined in <u>Section 5.7</u> and accordingly no representation or warranty is made with respect to title to that asset.

3.3.     <u>Material Adverse Change</u>. There has not been a Material Adverse Change.

-11-

3.4.   <u>No Conflicts</u>.  The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations under this Agreement and the consummation by Seller of the transactions contemplated by this Agreement do not, and will not,

(a)     violate any provision of law;

(b)     violate any provision of the certificate of incorporation or bylaws of the Seller except to the extent that the Confirmation Order, Plan, or any other Final Order of the Bankruptcy Court may authorize or provide otherwise;

(c)     require any consent waiver, approval or authorization of, declaration or filing with or notification to any governmental authority or other Person (whether pursuant to a contract or otherwise), other than (i) a consent, waiver, approval, authorization, declaration, filing or notification that has been obtained or made prior to the execution and delivery by the Seller of this Agreement; (n) consents, approvals or authorizations of, or filings with, the Bankruptcy Court and (o) any licenses or permits which Purchaser may need to operate the Acquired Assets;

(d)     violate, conflict with, constitute a default under or breach any term, condition or provision of any agreement or order (whether with the passage of time, the giving of notice or otherwise);

(e)     result in the termination of, give rise to a right of termination or cancellation of or accelerate the performance required pursuant to any contract of the Seller (whether with the passage of time, the giving of notice or otherwise); or

(f)     result in the creation of any Lien with respect to any Acquired Assets.

3.5   <u>Litigation</u>.  <u>Schedule 3.5</u> sets forth each instance in which the Seller (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. Except as set forth therein, none of the actions, suits, proceedings, hearings, and investigations set forth in <u>Schedule 3.5</u> could result in a Material Adverse Effect.

ARTICLE IV

<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

Purchaser represents and warrants to Seller as follows:

4.1.   <u>Organization</u>.  The Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of Connecticut.  The Purchaser has full power and authority to own, lease and operate its properties and to conduct its business as presently conducted.

-12-

4.2.    <u>Enforceability</u>.  The Purchaser has full power and authority to execute and deliver do Agreement to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement The execution and delivery by the Purchaser of this Agreement the performance by the Purchaser of its obligations under this Agreement and the consummation by the Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary action.  This Agreement has been duly and validly executed and delivered by the Purchaser and constitutes the legal valid and binding obligations of the Purchaser enforceable against it in accordance with its terms.

4.3.    <u>No Conflicts</u>.  The execution and delivery by the Purchaser of this Agreement, the performance by the Purchaser of its obligations under this Agreement and the consummation by the Purchaser of the transactions contemplated by this Agreement do not and will not,

(a)    violate any provision of any law;

(b)    violate any provision of the certificate of incorporation or bylaws of the Purchaser, or

(c)    require any consent, waiver, approval or authorization of, declaration or filing with or notification to any governmental authority or other Person (whether pursuant to a Contract or otherwise), other than (i) a consent waiver, approval, authorization, declaration, filing or notification that has been obtained or made prior to the execution and delivery by the Purchaser of this Agreement and (ii) consents, approvals or authorizations of, or filings with, the Bankruptcy Court.

4.4.    <u>Legal Proceedings</u>.  There are no legal proceedings pending or threatened that question the validity of this Agreement or any action taken or to be taken by the Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

ARTICLE V

<u>COVENANTS OF SELLER</u>

5.1.    <u>Implementing Agreement</u>.  Seller agrees that from the date hereof to the Closing Date, it will use its reasonable best efforts to fulfill its obligations under the terms of this Agreement.

5.2.    <u>Bankruptcy Actions</u>. (a) As promptly as practicable after the date hereof, but in no event later than two business days after Purchaser's execution of this Agreement (the "<u>Sale Procedures Motion Date</u>"), Seller will file with the Bankruptcy Court a motion, supporting papers and a form of Order substantially in the form of <u>Exhibit 5.2</u> (the "<u>Sale Procedures Order</u>"), seeking, on an expedited basis, the Bankruptcy Court's approval of the terms of this Agreement and Purchaser's observance and performance of such terms prior to Closing (the "<u>Sale Procedures Approval Date</u>").  The proposed Sales Procedure Order shall further schedule an auction of the assets to be sold under this Agreement on the Confirmation Hearing Date, which shall take place no more than thirty eight (38) days after Bankruptcy Court approval of the

Disclosure Statement and entry of the Sale Procedures Order, or on the next available Bankruptcy Court date thereafter.

(b)     As promptly as practicable after the date hereof, but in no event later than two business days after Purchaser's execution of this Agreement, the Plan Sponsors will file with the Bankruptcy Court a Plan and Disclosure Statement. The Plan shall be a plan to sell and transfer to Purchaser or any higher and better bidder, the Seller's assets according to the terms and provisions of this Agreement. Seller shall file a motion to expedite the hearing on the adequacy of the Disclosure Statement so that the Disclosure Statement Hearing Date is scheduled for the same date as the Sales Procedures Order Date.

(c)     As promptly as practicable, Seller will provide Purchaser with copies of all motions, applications and supporting papers prepared by Seller in connection with this Agreement (including forms of Orders and notices to interested parties) and all orders entered, notices given and objections received with respect to any of the foregoing prior to the filing thereof in the Chapter 11 Cases.

5.3     Access to Records and Properties.  From and after the date of this Agreement until the Closing Date, Seller shall afford to Purchaser's officers, independent public accountants, counsel, lenders, consultants, prospective operators and other representatives, reasonable access for examination at all reasonable times to the Acquired Assets and all records pertaining to the Acquired Assets including all information technology systems and computer systems. Seller shall also cause key personnel, including, without limitation, the administrator, or persons serving in comparable positions at the Seller's business premises, to be available for meetings and interviews related to the operation of the Seller's business. Seller shall also cause key personnel, including, without limitation, the information technology officer, to be available for meetings and interviews related to the transition of the Acquired Assets to Purchaser.

5.4     Inspection of the Owned Real Property.

(a)     The Purchaser and its agents shall have the right to inspect, examine, and/or investigate the Owned Real Property and all physical, environmental, financial and legal aspects thereof (including, the character, quality and general utility of such premises, the zoning, land use, environmental and building requirements and restrictions applicable to such premises and the state of title to such premises).

(b)     The Seller shall cooperate with the Purchaser in its inspections, examinations, and investigations including providing, to the extent in the Seller's possession, title insurance policies, if any, with copies of all title exceptions, boundary surveys, "As Built" plans, drawings, specifications, service and maintenance contracts, equipment leases, management agreements, environmental reports or surveys, or structural reports,  if any, for the Owned Real Property now in force or under negotiation, tax bills, certificates of occupancy, all permits, licenses and other governmental authorizations with respect to the Owned Real Property and all other pertinent information in the possession of the Seller.

(c)     Purchaser and Purchaser's agents shall be allowed access to the Owned Real Property and Seller's books, records and files regarding the same, including without limitation, architectural, engineering and environmental report and drawings, as applicable, for the purpose of inspecting the same.   The Purchaser shall also have access to the Owned Real Property for the purpose of conducting surface and subsurface tests and physical and environmental appraisals and studies.   Purchaser agrees to be responsible for the conduct of its employees and agents and shall indemnify, defend and hold the Seller harmless from any losses, injuries, damages, claims or expenses, including reasonable attorney's fees and costs, due to the conduct of Purchaser or its employees or agents or which are due to any such inspections, investigations or testing.

5.5     Conduct of the Business.

(a)     Seller shall not, prior to the Closing Date, directly or indirectly do, or propose or commit to do, any of the following, except as provided by this Agreement or otherwise ordered by the Bankruptcy Court:

(b)     sell, pledge, dispose of or encumber, or authorize the sale, pledge, disposition or encumbrance of any Acquired Assets, except in the ordinary course of business;

(c)     pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction approved by the Bankruptcy Court or otherwise in the ordinary course of business; and

(e)     otherwise operate its business other than in the ordinary course, consistent with past practice.

5.6     Indebtedness Owing to Samir Tadros, Inc.   Reference is hereby made to a $125,000 post-petition borrowing facility made by Samir Tadros, Inc. to the Seller. It is the Seller's intention to contest and/or negotiate the Tadros Debt and that any **reduction** in said Tadros Debt, after deduction and payment of any professional fees and costs allocable to the objection and resolution or prosecution thereof, will be split evenly between the Purchaser and the Seller.  The final resolution of the Tadros Debt, whether by settlement or litigation shall be made at the sole discretion of the Seller, subject to Bankruptcy Court approval.  The Seller hereby accepts, agrees and acknowledges that it shall promptly pay any amounts owing to Purchaser pursuant to this Section upon the settlement of the same.

5.7     Trademark Dispute.  Reference is hereby made to that certain trademark dispute among Wolf-Peter Graeser and Lavatec Laundry Technology, Inc. with respect to the Seller's owned trademark "Lavatec" (the "Trademark Dispute").  Such Trademark Dispute is currently pending before the United States Patent and Trademark Office.   The parties hereto accept, agree and acknowledge that any Losses with respect to the use of the Lavatec mark prior to the Closing Date, and any costs, fees, expenses or other Losses incurred by Seller in connection with the Trademark Dispute are not "Assumed Obligations" hereunder.  The Seller shall provide copies of any and all correspondence, communications, pleadings, complaints or any other information with respect to the Trademark Dispute to the Purchaser

-15-

contemporaneously with its receipt of the same. Seller agrees that from the date hereof to the Closing Date, it will use its reasonable best commercial efforts to protect the mark which is the subject to the Trademark Dispute and shall coordinate said efforts with the Purchaser and shall immediately provide the Purchaser with any developments or other information with respect to the Trademark Dispute. Upon the Closing of the transactions contemplated by this Agreement, the Seller agrees to take any further action reasonably required by the Purchaser, at Purchaser's expense, to join it as the successor party under the Trademark Dispute.

### 5.8    Connecticut Transfer Act.

(a)    The parties hereto accept, agree and acknowledge that the Owned Real Property is an "Establishment," as defined in Section 22a-134 *et seq*. (the **"Transfer Act"**) of the Connecticut General Statutes, as amended.   The Purchaser shall prepare and file a Form I, Form II, Form III or Form IV (the "Form"), and an "Environmental Condition Assessment Form" (the **"ECAF"**) as defined in the Transfer Act, and shall comply in all other respects with the requirements of the Transfer Act. The Purchaser shall be the "certifying party" (the "Certifying Party") as described in the Transfer Act and shall be responsible for investigating, remediating and monitoring the Owned Real Property as is required to be performed by the Certifying Party to satisfy its obligations under the Form III or Form IV. The Purchaser shall deliver to Seller, (a) not less than ten (10) days prior to the Closing, a copy of the appropriate Form and ECAF that Purchaser  intends to file with the Connecticut Department of Environmental Protection (the "DEP") in connection with the Closing, and (b) in the event of any revisions to the Form and the ECAF previously delivered to Seller, revised copies of the same prior to filing.  The Purchaser shall file the Form and ECAF with the DEP within ten (10) days after the Closing.  Thereafter, the Purchaser shall submit to the DEP all supplemental forms, reports, yearly updates and materials that may be required by the DEP in connection with such filings.  The Purchaser  shall pay all fees, costs and expenses required to be paid in connection with the preparation and filing of the Form (including, but not limited to, the initial filing fee), the ECAF, any such supplemental forms, reports, yearly updates or materials and any and all such investigation, remediation and monitoring activities.  For as long as required by the Transfer Act, the Purchaser shall execute all future Transfer Act Forms as Certifying Party and reimburse the Seller for all costs associated with such filing in the event that the Owned Real Property is transferred by Purchaser or any successor to Purchaser.

(b)    Upon the reasonable request of Purchaser, Seller will on and after the Closing Date execute and deliver to Purchaser such other documents, releases, assignments and other instruments as may be required under the Transfer Act.

(c)    The provisions of this Section 5.8 shall survive the Closing or the expiration or termination of this Agreement.

ARTICLE VI

COVENANTS OF PURCHASER

6.1.    Assumed Obligations.  Subject to Section 1.4 and the consummation of the transactions contemplated by Article XIII Purchaser agrees to assume and perform the Assumed Obligations as provided in Section 1.3.

6.2.    Payment of Purchase Price.  Subject to the consummation of the transactions contemplated by Article XIII hereof, Purchaser agrees to pay the Purchase Price, as the same may be adjusted, on the Closing Date as provided in Section 2.1. Notwithstanding the foregoing covenant:

(a)    The Confirmation Order must have been entered by the Bankruptcy Court prior to any payment hereunder by the Purchaser and any motion for rehearing or reconsideration of the Confirmation Order must have been denied or withdrawn.  In addition, prior to any such payment, the time allowed for appeals of the Confirmation Order must have expired without any appeal having been taken.

(b)    Notwithstanding (a) above, nothing in this Section, or any other section of this Agreement, will preclude any party from consummating the transactions contemplated in this Agreement if the Purchaser, in its sole discretion, waives the requirement that the Confirmation Order or any other order of the Bankruptcy Court be final orders.  No notice of such waiver of this or any other condition to Closing need be given except to the Seller or the Purchaser, as explicitly required in this Agreement, it being the intention of the parties to this Agreement that the Purchaser will be entitled to, and is not waiving, the mootness doctrine and any similar provision of law if the Closing occurs in the absence of final orders.

6.3    Third Party Assets.  Reference is hereby made to the items of machinery and equipment listed on Schedule 6.3 and located on the Owned Real Property, but owned by the third parties as listed on Schedule 6.3.  The Purchaser accepts, agreed and acknowledges that it shall be its responsibility and obligation to dispose of such items after the Closing Date.  To Seller's knowledge, there is no dispute, litigation, proceeding, hearing, action or similar item with respect to such items and the Seller has provided the Purchaser with all correspondence, communication or information in its possession with respect to such items.

ARTICLE VII

MUTUAL COVENANTS

7.1    Following the Closing and for a period of two  (2) years thereafter, each of the Seller and the Purchaser will afford the other party, its counsel and its accountants, during normal business hours, reasonable access to the books, records and other data relating to the Acquired Assets in its possession with respect to periods prior to the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting party in connection with (i) the preparation of Tax returns, (ii) the

-17-

determination or enforcement of rights and obligations under this Agreement, (iii) compliance with the requirements of any governmental authority or other agency, (iv) the determination or enforcement of the rights and obligations of any party to this Agreement or any of the agreements executed in connection herewith, or (v) in connection with any actual or threatened action or proceeding.

7.2     Notification of Certain Matters.

Each party shall give prompt notice to the other of (i) the occurrence or non-occurrence of any event the occurrence or nonoccurrence of which would be likely to cause any representation or warranty contained in this Agreement to be materially untrue or inaccurate, and (ii) any failure of such party to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder  provided, however, that the delivery of any notice pursuant to this Section shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice.

7.3     Further Action; Schedules.

Upon the terms and subject to the conditions hereof, each of the parties hereto shall use its reasonable best efforts to take or cause to be taken all appropriate action and to do or cause to be done all things necessary, proper or advisable under applicable law, subject to the requirements of Bankruptcy Court, to consummate the transactions contemplated by this Agreement as promptly as practicable, including using its reasonable best efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of any governmental authorities and parties to Seller's Contracts, and make any filings with respect thereto, as are necessary for the consummation of the transactions contemplated by this Agreement and to fulfill the conditions to the Closing.   In furtherance of the foregoing, from and after the date of this Agreement until the Closing Date, the Purchaser and the Seller shall cooperate on the preparation of the Schedules to this Agreement as described herein such that said Schedules shall be prepared as promptly as possible.  Notwithstanding the foregoing, the Seller may pursue an Alternative Transaction in accordance with the terms and conditions of this Agreement.


ARTICLE VIII

OVERBID PROCEDURES


8.1.    Overbid Procedures.  A Third Party interested in acquiring the Acquired Assets may submit to Seller an Acquisition Proposal in accordance with the provisions of the Sale Procedures Order and this Section 8.1. Such Acquisition Proposal must comply with the Sale Procedures order, which shall provide, among other things, that parties intending to submit Acquisition Proposals must do so no later than five (5) business days prior to the Confirmation Hearing.  A Third Party's failure to submit a qualified Acquisition Proposal shall disqualify that Third Party from bidding at any auction for the Acquired Assets or at the hearing to approve this Agreement (the "Confirmation Hearing").  Upon receipt of an Acquisition Proposal, Seller will

promptly notify Purchaser and indicate in such notice the identity of the offeror and a complete and accurate description of the material terms thereof. If a qualified overbid is timely received, an overbid auction shall be commenced by Plan Sponsors at the Bankruptcy Court (the "Overbid Auction"). Notwithstanding the foregoing, no Overbid Auction shall take place if no Third Party has submitted timely an Acquisition Proposal which complies with the terms of this Agreement and which, in the sole and absolute discretion of the Plan Sponsors is superior to the Purchaser's Acquisition Proposal. At the Overbid Auction, in its sole and absolute discretion, Purchaser may make an offer to improve the terms of this Agreement (a "Topping Offer"). Purchaser and any Third Party submitting an Acquisition Proposal may improve upon their respective offers to Seller at any time prior to the conclusion of the Overbid Auction, in increments of at least $100,000 in consideration. The Overbid Auction shall be deemed concluded in the discretion of the Plan Sponsors, and in any event no later than the commencement of the Confirmation Hearing. Neither Purchaser nor any Third Party shall be entitled to improve their respective Acquisition Proposals after the conclusion of the overbid Auction without the Bankruptcy Court's express approval. If upon the conclusion of the Overbid Auction, Purchaser has failed to make a Topping Offer or a Topping Offer which Plan Sponsors determine, in their sole and absolute discretion, to be better than any other Acquisition Proposal as may be amended prior to the conclusion of the Overbid Auction (taking into account any Break-up Fee), Seller may enter into a definitive agreement with the successful overbidding Third Party, and Purchaser will be entitled to the Break-up Fee upon the consummation of the transactions pursuant to such definitive agreement, subject to the terms and conditions set forth in Section 14.2 of this Agreement. In the event that Seller determines, in its sole and absolute discretion, that the last offer submitted by Purchaser is equal to or better than the last offer submitted by all Third Parties at the Overbid Auction (taking into account any Break-up Fee), then immediately following the conclusion of the Overbid Auction, Purchaser and Seller shall enter into an amendment to this Agreement to reflect Seller's acceptance of Purchaser's Topping Offer. If necessary, Purchaser and Seller shall consent to a brief continuance of the Confirmation Hearing (without any further right of overbidding) in order to complete the documentation of a successful Topping Offer.

Notwithstanding anything in this Agreement to the contrary, Seller may enter into an Alternative Transaction only if it (i) is in writing, (ii) provides for the acquisition of all or substantially all of the Acquired Assets and assumption of the Assumed obligations, (iii) provides for an amount to be realized by the Seller of at least $200,000 more than this Agreement, (iv) contains terms and conditions no less favorable to Seller than the terms and conditions contained in this Agreement, (v) provides for a closing date no later than the Alternative Transaction Deadline, (vi) includes evidence satisfactory to Seller, in its sole and absolute discretion, establishing that the Third Party is financially capable of timely performing in the event it is the successful bidder and (vii) includes a minimum cash deposit in an amount of at least $175,000 (an additional deposit may be requested by the Seller in its sole discretion), which amount shall be forfeited if the Third Party both (x) is the successful overbidder at the auction and (y) fails to consummate a transaction with the Seller on or before the Alternative Transaction Deadline.

8.2.    Survival. Following the execution of any amendment to this Agreement above, unless specifically amended in such amendments, the provisions of this Article VIII shall remain in effect and the receipt by Seller of any other offers, proposals or inquiries relating to any Acquisition Proposal shall be subject to the provisions of this Article VIII.

ARTICLE IX

CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Closing Date:

9.1.    Warranties True as of Both Present Date and Closing Date.  The representations and warranties of Seller contained herein shall be true in all material respects on and as of the date of this Agreement, and shall also be true in all material respects (except for such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

9.2.    Compliance with Agreements and Covenants.  Seller shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

9.3    Consents.  All Consents shall have been obtained.

9.4    Results of Due Diligence.  The Purchaser shall, after performing the above-referenced due diligence,  inspections, examinations, and/or investigations, of the Acquired Assets and the Owned Real Property (all as described in Sections 5.3 and 5.4 hereof) shall be fully satisfied, in its sole discretion, as to all of the foregoing.

9.5    Schedules.  The Purchaser and the Seller shall have completed the preparation of Schedules to this Agreement and the Purchaser, in its sole discretion, shall be fully satisfied as to the form and content of each Schedule hereto.  The Purchaser and the Seller shall each execute and deliver an attestation certifying the final Schedules.

9.6    Trademark Dispute.  There shall not have been an adverse ruling in the Trademark Dispute which, in the Purchaser's opinion, would result in a Material Adverse Change.

ARTICLE X

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at the option of Seller, subject to the satisfaction of the following conditions precedent on or before the Closing Date.

10.1.    Warranties True as of Both Present Date and Closing Date. The representations and warranties of Purchaser contained herein shall be true in all material respects on and as of the date of this Agreement, and shall also be true in all material respects (except for

-20-

such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date with the same force and effect as though made by Purchaser on and as of the Closing Date.

10.2.   Compliance with Agreements and Covenants; Certificate. Purchaser shall, in all material respects, have performed all obligations and agreements and complied with all covenants contained in this Agreement, to be performed and complied with by it on or prior to the Closing Date.

ARTICLE XI

MUTUAL CONDITIONS

The obligations of Seller and Purchaser under this Agreement are, at the option of Seller or Purchaser, as the case may be, subject to the satisfaction of the following conditions precedent on or before the Closing Date:

11.1.   Bankruptcy Conditions.  (a) The Confirmation Order shall have been entered by the Bankruptcy Court.  Any motion for rehearing or reconsideration of the Confirmation Order shall have been denied or withdrawn.  The time allowed for appeals of the Confirmation Order shall have expired without any appeal having been taken.

(b)     Nothing in this Section 11.1, or any other section of this Agreement, shall preclude Seller or Purchaser from consummating the transactions contemplated herein if Seller and Purchaser, in their sole discretion, jointly waive the requirements of Section 11.1(a) above. No notice of such waiver of this or any other condition to Closing need be given except to Seller or Purchaser, as explicitly required in this Agreement, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of the mootness doctrine or any similar provision of law if the Closing occurs in the absence of final orders.

(c)     The rejection or exclusion of the Rejected Contracts must have been approved by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code and an Order, which may be the Confirmation Order, approving such rejection in form and substance acceptable to the Purchaser must have been entered.   Any motion for rehearing or reconsideration of such Order must have been denied or withdrawn.  The time allowed for appeals of such Order must have expired without any appeal having been taken or, if appealed, no stay must be in effect.

11.2.   Actions or Proceedings.  No action or proceeding by any authority shall have been instituted or threatened which would enjoin, restrain or prohibit, or might result in substantial Losses in respect of, this Agreement or the complete consummation of the transactions as contemplated by this Agreement, or which would, in the reasonable judgment of Seller or Purchaser, make it inadvisable to consummate such transactions, and no court order shall have been entered in any action or proceeding instituted by any party which enjoins, restrains, or prohibits this Agreement or the complete consummation of the transactions as contemplated by this Agreement.

ARTICLE XII

EMPLOYEE MATTERS

12.1   <u>Employment</u>.  Purchaser shall offer employment, commencing on the Closing Date, to the Seller's employees on the terms and conditions as Purchaser shall determine; those employees to whom offers of employment are made under this Section and who commence employment as of the Closing Date or such other applicable date shall be collectively referred to as the "<u>Transferred Employees</u>."  Seller shall cooperate with Purchaser by making such announcements to the Transferred Employees as may be reasonably requested by Purchaser in connection with any such offer of employment.  Notwithstanding anything herein to the contrary, Purchaser's offer of employment to any particular Transferred Employee shall be conditioned upon such individual  satisfying reasonable pre-employment screening (e.g., background checks, drug testing, etc.).

12.2   <u>No Losses</u>. Except for the Assumed Obligations, Seller  shall be responsible for any and all Losses for wages, commission, employee benefits, retention or stay bonus arrangements and other compensation due to the employees of Seller arising out of their employment with Seller prior to and as of the Closing Date.  Seller shall be responsible for all workers' compensation claims of all employees, including without limitation Transferred Employees, arising out of events prior to the Closing Date.

ARTICLE XIII

CLOSING

13.1.   <u>Closing</u>.  The Closing shall take place at the offices of Barry S. Feigenbaum, Esq., Rogin Nassau LLC, 185 Asylum Street, 22nd Fl., Hartford, CT  06103-3460 at 10:00 A.M. Connecticut time on the fifth business day after the conditions set forth in Articles IX, X and XI hereof have been satisfied or waived by the party entitled to do so, or such other place or date as mutually agreed by the parties.

13.2.   <u>Deliveries by Seller</u>.  At the Closing, Seller will deliver the following to Purchaser: (a) such deeds, bills of sale, assignments, releases, consents to assignments and other instruments of sale, conveyance, assignment, assumption and transfer satisfactory in form and in substance to Purchaser and its counsel as may reasonably be required in order to convey to Purchaser all of Seller's rights, title and interests in and to the Acquired Assets, including, without limitation, the Intellectual Property and the Owned Real Property, in the manner provided for in this Agreement; (b) all Customer Orders; and (c) a receipt for the Purchase Price paid to Seller at the Closing; (c) that portion of the Current Assets which is a "deposit" as a cash payment to the Seller;  and (d) a certificate of the Seller that the Confirmation Order has become final and non-appealable.

13.3.   <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver the following to Seller: (a) the Purchase Price payable to Seller at the Closing pursuant to

-22-

Section 2.1; and (b) a receipt for the Acquired Assets and an agreement to assume the Assumed Obligations.

## ARTICLE XIV

## TERMINATION

14.1.   Termination.  This Agreement may be terminated at any time on or prior to the Closing Date: (a) by the written agreement of Purchaser and Seller; (b) by either Purchaser or Seller if there shall be in effect a final nonappealable Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; (c) by either Purchaser or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if there shall have been a material breach of any of the representations or warranties set forth in this Agreement on the part of the other party, and such party has not waived such failure of satisfaction; (d) by either Purchaser or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if there shall have been a material breach of any of the covenants or agreements set forth in this Agreement on the part of the other party, and such party has not waived such failure of satisfaction; (e) by Purchaser if it shall have determined that it has become apparent that one or more of the conditions set forth in Articles IX and XI cannot be fulfilled or satisfied on or prior to the date specified for fulfillment thereof; (f) by Seller if it shall have-reasonably determined that it has become apparent that one or more of the conditions set forth in Articles X and XI cannot be fulfilled or satisfied on or prior to the date specified for fulfillment thereof; (g) by Purchaser or Seller, if the Closing Date shall not have occurred on or prior to the Transaction Deadline, or such later date as may be mutually approved in writing by Purchaser and Seller; (h) by Purchaser or Seller, if a qualified Acquisition Proposal (as provided in the Sale Procedures Order) has been timely submitted and Purchaser (x) by Purchaser, if the Bankruptcy Court fails to approve the Break-up Fee as part of the Sale Procedures Order.

14.2.   Effect of Termination.

(a)      If this Agreement is terminated in accordance with Section 14.2 hereof and the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, except (i) for the provisions of Article VIII, Article XV and Article XVI,  (ii) that the termination of this Agreement for any cause shall not relieve any party hereto from any liability which at the time of termination had already accrued to any other party hereto and (iii) the Deposit (including any interest thereon) shall immediately be returned to the Purchaser in accordance with instructions  provided by the Purchaser.

(b)      Seller will pay Purchaser the Break-up Fee if and only if (i) Seller enters into an Alternative Transaction with a Third Party in accordance with the procedures outlined in Section 8.1, and (ii) the Alternative Transaction with a Third Party is consummated.  Upon such consummation of the Alternative Transaction, Seller will pay Purchaser the Break-up Fee by bank certified check or wire transfer of immediately available funds to an account specified by Purchaser.

ARTICLE XV

INDEMNIFICATION

15.1.    <u>Indemnification by Purchaser</u>.  Purchaser shall defend, indemnify, and hold harmless Seller and its officers, directors, and shareholders, and their transferees, successors, and assigns (individually, a "<u>Seller Indemnitee</u>" and collectively the "<u>Seller Indemnitees</u>"), from and against any and all Losses incurred by a Seller Indemnitee arising out of, related to, or resulting from (i) any breach by Purchaser of any obligation or covenant contained herein or any breach or inaccuracy of Purchaser's representations and warranties hereunder or (ii) any liability, obligation or debt with respect to the Assumed Obligations. Seller shall defend, indemnify, and hold harmless Purchaser and its officers, directors, and shareholders, and their transferees, successors, and assigns (individually, a "<u>Purchaser Indemnitee</u>" and collectively the "<u>Purchaser Indemnitees</u>"), from and against any and all Losses incurred by a Purchaser Indemnitee arising out of, related to, or resulting from (i) any breach by Seller of any obligation or covenant contained herein or any breach or inaccuracy of Seller's representations and warranties hereunder or (ii) any liability, obligation or debt incurred by Seller hereunder, which is not Seller's obligation by the terms of this Agreement or which is not an Assumed Obligation.

15.2.    <u>Procedure in Event of Indemnity</u>.

(1)    Notice to the indemnifying party shall be given promptly after receipt by any Seller Indemnitee or Purchaser Indemnitee of actual knowledge of the commencement of any action or the assertion of any claim that will likely result in a claim by it for indemnity pursuant to this Agreement.  Such notice shall set forth in reasonable detail the nature of such action or claim to the extent known, and include copies of any written correspondence from the party asserting such claim or initiating such action.  The indemnifying party shall be entitled, at its own expense, to assume or participate in the defense of such action or claim.  In the event that the indemnifying party assumes the defense of such action or claim, it shall be conducted by counsel chosen by such party and approved by the party seeking indemnification, which approval shall not be unreasonably withheld.

(2)    With respect to actions as to which the indemnifying party does not exercise its rights to assume the defense, the party seeking indemnification shall assume control the defense of and contest such action with counsel chosen by it and approved by the indemnifying party, which approval shall not be unreasonably withheld.  The indemnifying party shall be entitled to participate in the defense-of such action, the cost of such participation to be at its own expense.  The indemnifying party shall be obligated to pay the reasonable attorneys' fees and expenses of the party seeking indemnification to the extent that such fees and expenses related to claims as to which indemnification is payable under Sections 15.1 or 15.2, as such expenses are incurred.  The party seeking indemnification shall have full rights to dispose of such action and enter into any monetary compromise or settlement.

(3)     Both the indemnifying party and the indemnified party shall cooperate fully with one another in connection with the defense, compromise, or settlement of any such claim or action, including by making available to the other all pertinent information and witnesses within its control

15.3.   <u>Survival</u>.  The parties agree that this Article XV shall survive the closing contemplated herein.

15.4   <u>Disgorgement of Professional Fees</u>.  Notwithstanding anything in this Agreement to the contrary, no claim for indemnification by the Purchaser against the Seller shall require the disgorgement of any professional fees or expenses legitimately incurred and paid by the Seller in connection with the Chapter 11 Case, including, without limitation, the transactions contemplated by this Agreement.

ARTICLE XVI

<u>MISCELLANEOUS</u>

16.1.   <u>Expenses</u>.  Subject to Section 15.2, each party hereto shall bear its own expenses with respect to this transaction.  Seller agrees to pay and be responsible for sales, use, stamp, transfer, service, recording, real estate and like taxes or fees, if any, imposed by any authority, required to be paid by any party in connection with the transfer of the Acquired Assets.

16.2.   <u>Amendment</u>.  This Agreement, including any Schedule or Exhibit hereto, may be amended, modified or supplemented but only in writing signed by all of the parties hereto.

16.3.   <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person, (ii) on the date of transmission if sent by telex, telecopy or other wire transmission (provided that a copy of such transmission is simultaneously deposited in the manner provided in clause (iii) below) or (iii) three days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(A)     If to Seller, addressed as follows:

To be provided by Seller

Facsimile: To be provided by Seller

with copies to:

Dean W. Baker, Esq.
195 Church Street, Floor 8
New Haven, Connecticut 06510

-25-

Facsimile:  (203) 773-1427

(B)     If to Purchaser, addressed as follows:

Roeland van Delden
Vlijtweg 4
Wapenveld
Netherlands
8191 JP

Facsimile:

with copies to:

Barry S. Feigenbaum, Esq.
Rogin Nassau LLC
185 Asylum Street, 22nd Fl.
Hartford, CT  06103-3460

Facsimile:  (860) 278-2179

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

16.4.   Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

16.5.   Counterparts.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by either party.

16.6.   Headings.  The headings preceding the text of Articles and Sections of this Agreement and the Schedules thereto are for convenience only and shall not be deemed part of this Agreement.

16.7.   <u>APPLICABLE LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION.

16.8.   <u>Binding Nature; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties; except, that (i) Purchaser may assign any of its rights hereunder to any affiliate or wholly-owned subsidiary, (ii) Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and (iii) as otherwise provided in this Agreement.  Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement. nothing contained herein shall be deemed to give rise to any personal obligation of any of the directors, officers, stockholders, principals, attorneys, accountants or advisors of any of the parties hereto, by reason of any breach or violation of any of the provisions hereof or otherwise, and no party hereto shall have any right against, or be entitled to sue or seek any recovery from, any such Persons.

16.9.   <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto and their respective affiliates and no provision of this Agreement shall be deemed to confer upon third parties any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.,

16.10.   <u>Tax Matters</u>.  Purchaser shall make available to Seller, and Seller shall make available to Purchaser, (i) such records as any such party may require for the preparation of any Tax Returns required to be filed by Seller or Purchaser and (ii) such records as Seller or Purchaser may require for the defense of any audit, examination, administrative appeal, or litigation of any Tax Return in which Seller or Purchaser was included.  Purchaser  shall not be responsible for the preparation and filing of any Tax Returns for Seller including, without limitation, Tax Returns for any periods as to which Tax Returns are due (including the consolidated, unitary and combined Tax Returns for such Seller) which include the operations of the Seller's business for any period ending on or before the Closing Date. Purchaser shall not be responsible for any payments required with respect to any such Tax Returns.

16.11.   <u>Other Instruments</u>.  Upon the reasonable request of Purchaser, Seller will on and after the Closing Date execute and deliver to Purchaser such other documents, releases, assignments and other instruments as may be required to effectuate completely the transfer and assignment to Purchaser of, and to vest fully in Purchaser title to, each of the Acquired Assets and to consummate the transaction contemplated by this Agreement, including, without limitation, any document, instrument, agreement or form required under Section 5.8 hereof.

16.12.   <u>Construction</u>. (a) The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.' Any reference to any federal, state,

local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The parties hereto intend that each representation, warranty, and covenant contained herein shall have independent significance.

(b)    The definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase- "without limitation."

(c)    Unless the context shall otherwise require, all references herein to (i) Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (ii) Persons include their respective permitted successors and assigns or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons, (iii) agreements and other contractual instruments include subsequent amendments, assignments, and other modifications thereto to the date hereof and thereafter, but in the case of any amendment, assignment or modifications thereto are not prohibited by their terms or the terms of this Agreement, (iv) statutes and related regulations include any amendments of same and any successor statutes and regulations, and (v) time shall be deemed to be Connecticut time.

16.13.  Entire Understanding.  This Agreement sets forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof and is not intended to confer upon any other Person any rights or remedies hereunder. There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement.

16.14  Brokerage Obligations. Seller and the Purchaser each represent and warrant to the other that, such party has incurred no liability to any broker or other agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.

16.15   Assignments.   Seller may not assign its rights and obligations under this Agreement without the prior written consent of Purchaser. Purchaser may assign all or any of its rights and obligations to an affiliate of Purchaser or any other Third Party, provided, however, that such assignment shall not relieve Purchaser of its obligations hereunder if such affiliate, or Third Party does not perform such obligations.  This Agreement shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

16.16  Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to its choice of law provisions.

16.17  Bankruptcy Court Jurisdiction.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS

AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN
CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE
EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE
THE EXCLUSIVE VENUE TO  RESOLVE ANY AND  ALL  DISPUTES  RELATING
TO  THE  TRANSACTION CONTEMPLATED BY THIS AGREEMENT.    SUCH
COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE
PARTIES AFFECTED THEREBY AND PURCHASER AND SELLER EACH HEREBY
CONSENT AND SUBMIT TO SUCH JURISDICTION.


[SIGNATURE PAGE FOLLOWS]

  IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered on the date first above written.

PURCHASER:

LAUNDRY ACQUISITION INC.

By: /s/ Roeland van Delden
Name: Roeland van Delden
Title: President

SELLER:

LAVATEC, INC.

By:  /s/  Herman Bernstein
Name: Herman Bernstein
Title: President

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Inventory |
| Schedule 1.1(b) | Machinery |
| Schedule 1.1(c) | Cash and Accounts Receivable |
| Schedule 1.1(d) | Seller Purchase Orders |
| Schedule 1.1(e) | Customers Orders |
| Schedule 1.1(f) | Furniture, Desks, Files, Etc. |
| Schedule 1.1(g) | Owned Real Property |
| Schedule 1.1(i) | All deposits and prepaid expenses made or paid to utility companies, vendors or otherwise |
| Schedule 1.1(j) | Intellectual Property |
| Schedule 1.1(k) | Assumed Contracts |
| Schedule 1.1(l) | Licenses and Permits |
| Schedule 1.1(m) | Motor Vehicles |
| Schedule 1.2(c) | Rejected Contracts |
| Schedule 1.3 | Assumed Obligations |
| Schedule 2.3 | Current Asset Count |
| Schedule 3.5 | Litigation |
| Schedule 6.3 | Third Party Assets |

## EXHIBITS

| | |
|---|---|
| Exhibit 5.2 | Form of Sales Procedure Order |
| Exhibit 8.1(a) | Form of Confirmation Order or Order in aid of Confirmation |

**EXHIBIT B-2**

**CONFIDENTIALITY AGREEMENT**

This Confidentiality Agreement (the "Agreement) is dated as of _____ 2011, by and between Lavatec, Inc. (the "Disclosing Party") and _____ (the "Interested Party").

1.      **Confidential Information Representatives.**  The Interested Party is considering a possible transaction with the Disclosing Party (the "Transaction"), and in order to assist the Interested Party in evaluating the Transaction, the Disclosing Party is prepared to make available to the Interested Party certain confidential, non-public or proprietary information (the "Confidential Information").    The Confidential Information shall include all information, regardless of the form in which it is communicated or maintained (whether prepared by the Disclosing Party or otherwise) that contains or otherwise reflects information concerning the Disclosing Party that an Interested Party may be provided by or on behalf the Disclosing Party in the course of evaluating a possible Transaction.  As a condition to the Confidential Information being furnished to the Interested Party and its directors, officers, employees, agents and advisors (collectively, "Representatives"), the Interested Party agrees to treat the Confidential Information in accordance with the provisions of this Agreement and to take or abstain from taking certain other actions hereinafter set forth.

2.      **Excluded Information.**    The Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of acts by the Interested Party in breach of the terms of this Agreement, (ii) is lawfully in the Interested Party's possession prior to disclosure by the Disclosing Party, or (iii) is required to be disclosed by law.

3.      **Non-Disclosure of Confidential Information.**  The Interested Party and its Representatives shall use the Confidential Information solely for the purpose of evaluating a possible Transaction.  The Interested Party shall keep the Confidential Information in strict confidence and shall not disclose any of the Confidential Information in any manner whatsoever; provided, however, that (i) the Interested Party may make any disclosure of information contained in the Confidential Information to which the Disclosing Party gives its prior written consent, and (ii) any information contained in the Confidential Information may be disclosed to the Interested Party's Representatives who need to know such information for the purpose of evaluating a possible Transaction with the Disclosing Party and who agree in writing to keep such information confidential.  The Interested Party shall be responsible for any breach of the terms of this Agreement by any of its Representatives.

4.      **Non-Disclosure of Existence of Negotiations.**  Without the prior written consent of the Disclosing Party, or unless required by law, neither the Interested Party nor its Representatives shall disclose to any other person that it has received the Confidential Information or that discussions or negotiations are taking place between the parties concerning a possible Transaction, including the status of such discussions or negotiations.

5.      **Return of Confidential Information.**  Promptly upon the request of the Disclosing Party, (i) the Interested Party shall return all copies of the Confidential Information to the Disclosing Party, (ii) all notes, studies, reports, memoranda and other documents prepared by the Interested Party or its Representatives that contain or reflect the Confidential Information ("Notes") shall be destroyed, and (iii) the Interested Party shall certify in writing to the Disclosing Party that the Notes have been destroyed.

6.      **Subpoena or Court Order.**  In the event that the Interested Party or anyone to whom it discloses the Confidential Information receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena or other order issued by a court of competent jurisdiction or by another governmental agency, the Interested Party shall (i) promptly notify the Disclosing Party of the existence, terms and circumstances surrounding such a request, (ii) consult with the Disclosing Party on the advisability of taking steps to resist or narrow such request, (iii) if disclosure of such Confidential Information is required, furnish only such portion of the Confidential Information as the Interested Party is advised by counsel is legally required to be disclosed, and (iv) cooperate with the Disclosing Party in its efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information that is required to be disclosed.

7.      **Disclaimer of Warranty.**  Neither the Disclosing Party nor its Representatives has made or makes any representation or warranty as to the accuracy or completeness of the Confidential Information.  The Interested Party agrees that neither the Disclosing Party nor its members, directors, officers, employees or affiliates shall have any liability to the Interested Party or any of its Representatives resulting directly or indirectly from the Interested Party's use of the Confidential Information.

8.      **Definitive Agreement.**  Unless and until a definitive written agreement between the Disclosing Party and the Interested Party with respect to a Transaction has been executed and delivered, neither the Disclosing Party nor the Interested Party shall be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this or any other written or oral expression by either of them or their Representatives except, in the case of this Agreement, for the matters specifically agreed to herein.

9.      **Employees and Officers of the Disclosing Party.**  For a period of two (2) years from and after the date of this Agreement, without the Disclosing Party's prior written consent, the Interested Party shall not employ, or solicit to employ any of the employees or officers of the Disclosing Party.

10.      **Property Rights.**  All Confidential Information disclosed by or on behalf of the Disclosing Party to the Interested Party or their Representatives shall remain the property of Disclosing Party.  No licenses or rights under any patent, copyright, trademark, trade name, trade secret or other intellectual property are granted to the Interested Party, or are to be implied by reason of this Agreement.

11.      **Remedies.**  The Interested Party acknowledges that in the event of any breach of the terms of this Agreement by the Interested Party, the Disclosing Party may not be made whole by monetary damages.  Accordingly, the Disclosing Party, in addition to any other remedy to which it may be entitled in law or in equity, may be entitled to (i) an injunction to prevent breaches of this Agreement, and (ii) an order compelling specific performance of this

Agreement.   Such breaching Interested Party shall reimburse the Disclosing Party for all reasonable costs and expenses, including reasonable attorneys' fees, incurred by the Disclosing Party in the event that it finds it necessary to enforce the obligations of the Interested Party or its Representatives hereunder.

12.    **Entire Agreement.**   This Agreement represents the entire understanding and agreement of the parties hereto with respect to the matters contained herein, and may be modified or waived only by a separate writing executed by the Disclosing Party and the Interested Party expressly so modifying or waiving this Agreement.

13.    **No Waiver.**   No failure or delay by the Disclosing Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

14.    **Governing Law.**  This Agreement shall be governed and construed in accordance with the internal laws of the State of Connecticut, without regard to the laws of conflict of laws.

15.    **Captions.**   The Captions contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provisions of this Agreement.

16.    **Counterparts.**   This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement.

**IN WITNESS WHEREOF, THIS AGREEMENT** is executed and delivered effective as of the date first written above.

THE DISCLOSING PARTY:

Lavatec, Inc.


By_____

Its


THE INTERESTED PARTY:

_____


By_____

Its

**EXHIBIT C**

| CURRENT ASSETS | Current book value | Chapter 7 Projection |
|---|---|---|
| Cash | $  350,000 | $  350,000 |
| Accounts Receivable | 375,000 | 187,500 |
| Inventories | 1,535,000 | 300,000 |
| Deposits | 40,000 | 0 |
| Total Current Assets | 2,300,000 | 837,500 |
| Land, Building & Equipment | 1,350,000 | 1,900,000 |
| TOTAL ASSETS | 3,650,000 | 2,737,500 |

| LIABILITIES | | |
|---|---|---|
| (secured, admin and priority) | | |
| Mortgage Payable | 2,650,000 | 2,650,000 |
| Line of Credit | 500,000 | 500,000 |
| State of Connecticut | 280,000 | 280,000 |
| Naugatuck Property Tax | 70,000 | 70,000 |
| Chapter 11 Prof. Fees | 125,000 | 125,000 |
| Samir Tadros Inc. | 140,000 | 140,000 |
| Priority/Tax Claims | 264,000 | 264,000 |
| Trustee Expense Chapter 7 | | 100,000 (@ less than 5%) |
| Chapter 7 Professional Fees | | |
| CH 11 US Trustee | 10,000 | 10,000 |
| TOTAL SECURED/ADMIN/PRIORITY | 4,039,000 | 4,139,000 |
| EQUITY | (389,000) | (1,401,500) |
| AMOUNT AVAILABLE | 0 | 0 |
| FOR UNSECURED CLAIMS | | |